**CITY OF LINCOLN CITY, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF INTERIOR and Confederated Tribes of Siletz Indians of Oregon, Defendants.**

**No. CIV.99–330–AS.**

United States District Court,
D. Oregon.

April 17, 2002.

Christopher P. Thomas, Moskowitz & Thomas, Portland, OR, for City of Lincoln City.

Tim W. Simmons, U.S. Attorney's Office, Portland, OR, for secretary of Dept. of Interior.

Tim W. Simmons, U.S. Attorney's Office, Portland, OR, Craig J. Dorsay, Jennifer K. deWald, Portland, OR, for Confederated Tribes of Siletz Indians of Oregon.

## OPINION

ASHMANSKAS, United States Magistrate Judge.

This is an action by Lincoln City, Oregon ("City"), against the United States and the Confederated Tribes of Siletz Indians ("Tribe") to overturn a decision by the Department of Interior ("Interior"), Bureau of Indian Affairs ("BIA"), permitting a fee-to-trust transfer of property from the Tribe to the United States. The Tribe moves to dismiss the City's seventh and eighth claims on the ground that the Tribe is an indispensable party which cannot be joined because of its sovereign immunity. The Tribe and Interior move for summary judgment on the City's claims under the Coastal Zone Management Act ("CZMA").

The Tribe moves for summary judgment in its favor on its fourth counterclaim and on the City's first, fourth, fifth and sixth claims. Interior moves for summary judgment in its favor on all of the City's claims.

## FACTUAL BACKGROUND

The Tribe owns a parcel of land situated in the City known as the Lakeside Village Property ("Property"). Before the Tribe acquired the Property, the previous owner had designed and begun development of a 144–dwelling subdivision. The City had approved the previous owner's subdivision as a Planned Unit Development ("PUD") under local land use law. On August 19, 1995, the Tribe submitted a "fee-to-trust" application to the BIA, requesting that the Property be taken into trust by the United States for the benefit of the Tribe. *See* 25 U.S.C. § 465; 25 C.F.R. Part 151. Under 25 U.S.C. § 465, which is part of the Indian Reorganization Act of 1934 ("IRA"), Interior has the authority to place land in trust to be held by the federal government for the benefit of Indians and to be exempt from state and local property taxes. Otherwise, off-reservation property and previously allotted on-reservation property owned by an Indian or an Indian tribe may be subject to state and local taxation. *Cass County, Minnesota v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 114, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998).

The Tribe's application for fee-to-trust transfer stated that it intended to develop the Property consistent with the PUD previously approved by the City. Upon receipt of the Tribe's application the Superintendent of the Siletz Agency of the BIA ("the Superintendent") invited comments from the City and other local entities and began conducting the required analyses under the CZMA and the National Environmental Policy Act ("NEPA"). The City submitted comments on the Tribe's application to BIA. On October 18, 1996, the Superintendent issued a written recommendation that the Tribe's application be approved. On January 7, 1997, the Portland Area Director of the BIA approved the application. The City appealed to Interior's Board of Indian Appeals "(IBIA")". On January 14, 1999, the IBIA affirmed the Superintendent's decision to take the Property in trust for the Tribe.

## STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## DISCUSSION

**1. Tribe's Motion to Dismiss Claims Seven and Eight on Basis of Tribal Immunity.**

In the seventh and eighth claims, the City alleges that the fee-to-trust transfer should be set aside because it violates the Republican Form of Government guarantee of Article IV, section 4 of the United States Constitution. The gravamen of the claim is that the fee-to-trust transfer deprives the state of Oregon and the City of full authority over the lands within its boundaries in violation of Article IV, section 3 of the Constitution because it would permit Indian residents on the Property to vote while exempting them from local taxes and from local civil and criminal law.

The Tribe asserts that it is an indispensable party that cannot be joined due to its sovereign immunity, and therefore the seventh and eighth claims must be dismissed. The City and Interior oppose the motion, Interior on the ground that the Tribe is not an indispensable party.

### Tribal immunity

■ Indian tribes have been recognized, first by the European nations, later by the United States, as distinct, independent political entities, qualified to exercise self-government by reason of their original tribal sovereignty. *State of Montana v. Gilham*, 133 F.3d 1133, 1135 (9th Cir. 1998); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 519, 8 L.Ed. 483 (1832). The tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress, *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 788 n. 30, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), or is inconsistent with the overriding interest of the federal government. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 153, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). *See also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)(Congress has plenary power over tribes).

■ "Foremost among the attributes of sovereignty retained by Indian tribes is immunity from suit. Absent Congressional action, consent or waiver, an Indian tribe may not be subject to suit in state or federal court." *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670; *Snow v. Quinault Indian Nation*, 709 F.2d 1319, 1321 (9th Cir.1983). Indian tribes may consent to suit without explicit Congressional authority, *In re White*, 139 F.3d 1268 (9th Cir.1998), but waiver cannot be implied; it must be expressed unequivocally. *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir.1989). The Tribe's participation in the underlying administrative proceeding in this case does not constitute a waiver of tribal immunity for purposes of an action filed by a third party seeking review of the agency's decision. *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir.1996).

If the Tribe is a necessary party, then the Tribe is correct in its assertion that sovereign immunity precludes its being joined in this action. *Kescoli*, 101 F.3d at 1310; *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir.1991).

### Is the Tribe a necessary party?

■ Joinder is governed by Rule 19 of the Federal Rules of Civil Procedure. Whether a party is necessary and indispensable is a pragmatic and equitable determination, not a jurisdictional one. *Simpson v. Alaska State Comm'n for Human Rights*, 608 F.2d 1171, 1174–75 n. 5 (9th Cir.1979). *See also Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir.1999) (Rule 19 inquiry is practical and fact specific).

■ Whether an action should be dismissed under Rule 19 involves a two-part analysis. First, the district court must determine whether the absent party is a "necessary" party. *United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 907 (9th Cir.1994). A party is "necessary" in two circumstances: 1) when complete relief is not possible without the absent party's presence, or 2) when the absent party claims a legally protected interest in the action. *Yellowstone County v. Pease*, 96 F.3d 1169, 1172 (9th Cir.1996). If the absent party is "necessary," the court must determine whether joinder is feasible. *United States v. Bowen*, 172 F.3d 682, 687 (9th Cir.1999). If the absent party is necessary and joinder is not feasible, the court must determine whether the party is "indispensable," *i.e.*, whether in "equity and good conscience" the action can continue without the absent party. *Bowen*, 172 F.3d at 688. To make the indispensability determination, the court balances four factors: 1) prejudice to any party or to the absent party; 2) whether relief can be shaped to lessen

prejudice; 3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and 4) whether there exists an alternative forum. *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir.1994). If the court determines that a party is not necessary, it need not consider whether it is an indispensable party under Rule 19(b). *Washington v. Daley*, 173 F.3d 1158, 1169 (9th Cir.1999).The moving party has the burden of proving that dismissal is warranted. *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir.1992).

Although the Tribe contends that it is a necessary party because its interest cannot be adequately represented by the United States, the Ninth Circuit has many times held that the United States may adequately represent an Indian tribe unless there is a conflict of interest between them. *Shermoen*, 982 F.2d at 1318; *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990); *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir.1998); *Washington*, 173 F.3d at 1167. To prevail on a claim that the United States cannot adequately represent the Tribe's interest, the Tribe must not only identify the alleged conflict but demonstrate how such a conflict might actually arise under the facts of the case. *Washington*, 173 F.3d at 1168; *Southwest Center*, 150 F.3d at 1154. Such actual conflict has been found in cases involving intertribal conflicts where the United States cannot properly represent any of the tribes without compromising trust obligations owed to all tribes. *See Shermoen*, 982 F.2d at 1318; *Quileute Indian Tribe*, 18 F.3d at 1460.

I am not persuaded that the Tribe has met its burden of identifying an actual conflict of interest between itself and Interior relating to claims seven and eight. In its reply brief, the Tribe asserts that such a conflict is apparent in their differing views about the applicability of the CZMA, but the CZMA is unrelated to claims seven and eight, which challenge the constitutionality of fee-to-trust transfers. *See Southwest Center for Biological Diversity*, 150 F.3d at 1154 (rejecting "possibility of conflict").

I also disagree with the Tribe's overall premise that the City's claims seven and eight are "aimed at the heart of inherent tribal sovereignty and autonomy" and "are not directed at the federal government." Claims seven and eight challenge the constitutionality of a federal statute which permits tribes to avoid state and local regulation and taxes through fee-to-trust transfers. If the court were to hold that such fee-to-trust transfers were unconstitutional, the primary effect of the ruling would be to extinguish a statutory right created by Congress, not to disrupt tribal sovereignty and autonomy.

I therefore do not believe the Tribe has shown that it is a necessary party. I need not, therefore, determine whether the Tribe is indispensable. *Washington*, 173 F.3d at 1169. The Tribe's motion to dismiss the seventh and eighth claims is denied.

## 2. Interior's Motion to Dismiss Claims Seven and Eight for Failure to State a Claim.

***Does the fee-to-trust transfer result in a form of government which violates Article IV, section 4 of the United States Constitution?***

The City's seventh claim for relief is for violation of the constitutional guarantee of a republican form of government. The City contends that if the fee-to-trust transfer occurs, Indian residents of the Property will be entitled to vote in state, city and local government elections, without being subject to state, city and local property taxes or other taxes related to activities

conducted on the Property or to municipal and local civil and criminal regulations. The result, according to the City, is the creation of a "form of government" which violates the guarantee of a republican form of government contained in Article IV, Section 4 of the United States Constitution.

Interior moves to dismiss this claim on two grounds. The first is that it is not justiciable because it is a political question. The second is on the merits: even assuming that tribal members only would be living on the Property and would pay no city or local property taxes, this eventuality would not change the City's, county's, or state's existing republican form of government.

*Justiciability.* Interior points out that the guarantee of a republican form of government has been defined by the Supreme Court as the right of the people to choose their own governmental officers and pass their own laws within the limits of their written constitutions, *Duncan v. McCall,* 139 U.S. 449, 461, 11 S.Ct. 573, 35 L.Ed. 219 (1891), and is generally invoked when Congress admits a new state to the Union. Interior argues that claims based upon the clause have virtually always been found to be non-justiciable as political questions. *See, e.g., State of California v. United States,* 104 F.3d 1086 (9th Cir.1997)(California claim that federal immigration policy had forced it to spend public money providing benefits for illegal aliens, thus depriving it of a republican form of government); *City of Rome v. United States,* 446 U.S. 156, 182 n. 17, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980)(challenge to the pre-clearance requirements of the Voting Rights Act); *Baker v. Carr,* 369 U.S. 186, 218–29, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)(challenge to apportionment of state legislative districts); *Pacific States Telephone & Telegraph Co. v. Oregon,* 223 U.S. 118, 140–51, 32 S.Ct. 224, 56 L.Ed. 377 (1912)(challenge to initiative and referendum provisions of state constitution); *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

The City argues that in *New York v. United States,* the Supreme Court held that it was an open question whether, and the extent to which, issues based on the guarantee of a republican form of government were justiciable. In that case, the State of New York challenged a federal statute providing monetary and other incentives to states for creating radioactive waste disposal sites. The Supreme Court held that the statute could not reasonably be said to deny any state a republican form of government. While having a potential adverse effect on a particular state, the statute did not "pose any realistic risk of altering the form or the method of functioning of New York's government." 505 U.S. at 185–86, 112 S.Ct. 2408.

In arriving at that conclusion, the Court indicated that its own precedent had "suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable questions." 505 U.S. at 184–85, 112 S.Ct. 2408. It cited *Reynolds v. Sims,* 377 U.S. 533, 582, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)(some questions raised under Guarantee Clause are non-justiciable). Nevertheless, the Court held, "[E]ven indulging the assumption that the Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in this case." *Id.* Despite their argument that claims under the Guarantee Clause are not necessarily non-justiciable, the City has not cited a single case where such a claim was permitted to go forward. I doubt that this would be such a case. However, I do not reach the issue because I conclude that the City's seventh claim should be dismissed on the merits.

**■** *Whether the fee-to-trust transfer in fact alters an existing form of government.* The republican form of government was defined by the Supreme Court in *Duncan v. McCall*, 139 U.S. at 461, 11 S.Ct. 573 as follows:

the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves, but while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.

The City has not cited a case holding, or even suggesting, that exempting certain individuals from property taxation while still permitting them to vote defeats a republican form of government. Indeed, as Interior points out, federal, state, county and municipal governments frequently exempt certain classes of property owners from taxation without also depriving them of the right to vote.

Moreover, even the City's worst case scenario—that every single resident on the Property would be an Indian eligible to vote but exempt from property taxes and municipal regulatory ordinances—is too small and localized to pose "any realistic risk of altering the form or the method of functioning [of government]", *see New York v. United States*, 505 U.S. at 185–86, 112 S.Ct. 2408. As Interior points out, "The fact that a parcel of land will no longer be subject to the City's regulatory jurisdiction or will not be subject to property tax will not affect the republican nature of state government," or even, for that matter, of municipal government.

Interior also points out that at this stage, all that is known is that the Property itself, while held in trust by the United States, would not be subject to ad valorem property taxes. The Tribe's stated purpose for the Property is single family housing that would be open to the public. At this stage, it would be speculating to assume that most or all of the people living on the Property would be tribal members not subject to property taxes. Interior's motion to dismiss the City's seventh claim is granted.

***Does the fee-to-trust transfer violate the Equal Footing Clause?***

**■** The City's eighth claim for relief is that the fee-to-trust transfer violates Article IV, section 3 of the United States Constitution and the Act of Congress admitting Oregon to the Union because it deprives the state of Oregon and the City of "full authority over the lands within its boundaries." Pretrial Order, p. 27–28. The City argues that this deprivation violates the equal footing doctrine.

The "equal footing doctrine" is the constitutional principle that all states are admitted to the Union with the same attributes of sovereignty (*i.e.*, on equal footing) as the original 13 states. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). The equal footing doctrine prevents the federal government from impairing fundamental attributes of state sovereignty when it admits new states into the union. *Id.* at 203–04, 119 S.Ct. 1187.

The City argues that under the equal footing doctrine, when a state enters the Union, it does so with all governmental powers not delegated to the federal government or forbidden to the states—in other words, with full governmental authority over the lands within its boundaries. However, the City asserts, when

the United States accepts land in trust for the benefit of Indian tribes, it deprives states and their political subdivisions of full governmental authority over those lands. The City argues that the Constitution has not delegated this authority to the United States.

I do not find this argument persuasive. In general, a state's authority over the land within its boundaries is subject to the sovereignty of an Indian tribe over its lands. *See, e.g., McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 170–71, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)(state lacks jurisdiction over both Indian people and Indian lands); *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 659 (9th Cir.1975)*(en banc)* (Congress intended that states have no power to regulate Indian use or governance of the reservation except as Congress chose to grant that power). Thus, tribal land is not and never has been subject to the full authority of the state. There can be no "delegation" of authority to Indian tribes over their own lands by the Constitution or by Congress because Indian tribes are qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty. *Gilham,* 133 F.3d at 1135. *See also Native Village of Venetie I.R.A. Council v. Alaska,* 944 F.2d 548, 556 (9th Cir. 1991)(tribes' status as distinct, independent political communities qualified to exercise powers of self-government arises from their original tribal sovereignty over their members rather than from any constitutional source). The tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress, *La Jolla Band of Mission Indians,* 466 U.S. at 788 n. 30, 104 S.Ct. 2105, or found inconsistent with the overriding interest of the federal government. *Confederated Tribes of Colville Indian Reservation,* 447 U.S. at 153, 100

S.Ct. 2069. *See also Native Village of Venetie,* 944 F.2d at 556.

Further, under the Supremacy Clause, the provisions of federal law governing fee-to-trust transfers affect all the states equally, so the application of federal law to the State of Oregon in this instance does not place Oregon or its political subdivisions on a different footing from any other state. Interior's motion to dismiss the City's eighth claim is granted.

**3. Interior's motion for summary judgment on the CZMA claim and Tribe's motion for summary judgment that the CZMA does not apply to fee-to-trust applications.**

The City's third claim for relief is that Interior's approval of the application for a fee-to-trust transfer was the result of inadequate and improper evaluation of the application under the CZMA, 16 U.S.C. §§ 1455–65, because 1) Interior's approval of the fee-to-trust transfer was unconditional, imposing no restrictions on the use of the Property, while the application itself was premised on a specific project; 2) the Oregon Coastal Management Plan ("OCMP") requires mitigation of adverse impacts on Highway 101, but the administrative record provides no support for Interior's finding that such mitigation measures would be implemented by the Tribe; and 3) Interior had no authority to accept the fee-to-trust transfer while the City's appeal to the Land Use Board of Appeals ("LUBA") was pending.

Interior challenges the City's standing to assert a claim under the CZMA, arguing that only a state can be adversely affected or aggrieved by a federal agency's failure to comply with the CZMA. Interior asserts that because the City plays no role in the consistency determination process except to offer comments, which it has already done, the City has no standing to

take the process any further. The City counters that it has a stake in the OCMP and therefore has standing to litigate whether the BIA has complied with the OCMP.

Interior also asserts that the evidence relevant to mitigation for Highway 101 is sufficient. The Tribe contends that the CZMA does not apply to the acquisition of land in trust by the Tribe under either the Siletz Restoration Act or general federal law. Further, the Tribe asserts that even if the CZMA does apply to the transfer, it applies only to Interior's approval of the transfer itself and not to the Tribe's actions in proposing a use for the Property. The Tribe also argues that application of the CZMA to the Tribe would violate equal protection.

I conclude that when it took the Property into trust, the BIA complied with the CZMA, and once the Property was taken into trust for the Tribe, the CZMA no longer applied to the Property.

### Does the CZMA apply to the fee-to-trust transfer?

As discussed above, the authority of the Secretary of the Interior to acquire land in trust for the benefit of an Indian tribe is derived from part of the IRA, 25 U.S.C. § 465. When the Tribe was restored to federally-recognized status in 1977 by the Siletz Restoration Act, 25 U.S.C. § 711a(a), Congress expressly made 25 U.S.C. § 465 applicable to the Tribe.

The CZMA was enacted in 1972, five years before passage of the Siletz Restoration Act. The CZMA was intended to enhance management of coastal areas by encouraging the states to exercise their full authority over the lands and waters in the coastal zone. 16 U.S.C. § 1451(i). States are required to adopt Coastal Management Programs in coordination and after consultation with affected federal agencies. 16 U.S.C. §§ 1456(b); 1452(2)(G). Oregon adopted a Coastal Zone Management Program, the OCMP, which was approved by the federal Office of Coastal Zone Management.

The CZMA requires that federal agencies which take action reasonably likely to affect or use coastal resources file a consistency determination that the federal action is consistent to the maximum extent practicable with the policies of the coastal state's Coastal Management Plan, i.e., the OCMP. In Oregon, this consistency determination must be filed with the Oregon Department of Land Conservation and Development ("DLCD") for review. The BIA submitted its determination of consistency to the DLCD in September 1996. In December 1996, DLCD informed the BIA, the Tribe and the City that it agreed with the BIA's consistency determination. The City then appealed the DLCD decision to the Land Conservation and Development Commission ("LCDC"). LCDC affirmed the DLCD. The City then appealed to the Marion County Circuit Court. The Circuit Court held that the case was moot, but nonetheless affirmed the administrative agencies. The City has now appealed to the Court of Appeals.

The Tribe's argument against the CZMA claim is that "the hallmark of land held in trust for the benefit of Indian tribes ... is that such land is completely free of state authority and regulation, especially land use laws." Tribe's Memo in Support, p. 3–4, citing McClanahan, 411 U.S. at 170–71, 181, 93 S.Ct. 1257 (state laws generally do not apply to tribal Indians on Indian reservations except when Congress has expressly so provided); Santa Rosa Band of Indians, 532 F.2d at 659 (County without jurisdiction to enforce zoning ordinances or building codes on Indian trust land).

Congress has not chosen to extend the CZMA to land taken in a fee-to-trust transfer. The definition of "coastal zone"

in the CZMA, 16 U.S.C. § 1453(1) provides: "Excluded from the coastal zone are lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents." As the Tribe points out, legislative history to the CZMA shows that Indian reservations fall within this definition:

> All federal agencies conducting or supporting activities in the coastal zone are required to administer their programs consistent with approved state management programs. However, such requirements do not ... extend state authority to land subject solely to the discretion of the Federal Government such as ... Indian reservations...

S.Rep. No. 753, 92nd Cong., 2d Sess., 1972 U.S.Code, Cong. & Admin. News 4776, 4783. Section 465 gives the Secretary of the Interior discretion to acquire lands on behalf of Indians.

The Tribe argues that in addition to this specific exclusion of Indian lands from the CZMA, other laws pertaining to Indians suggest, by omission, that the CZMA was never intended to apply to Indian tribes in general, or the Siletz Tribe in particular.

***The Siletz Restoration Act.*** Certain enumerated provisions of federal law were made applicable to the Tribe in 1977 by the Siletz Restoration Act. These enumerated provisions included parts of the IRA, and specifically 25 U.S.C. § 465 (the fee-to-trust provision). The CZMA was not one of the enumerated provisions, even though the CZMA was in existence at the time.

***Public Law 280.*** At the time of restoration, Congress specifically imposed Public Law 280 on the Tribe. *See* 25 U.S.C. § 711e(d)(6)(any reservation established for the Siletz Tribe would be subject to Pub.L. 280). It did so again when the Tribe obtained its reservation. Pub.L. 96–340. Public Law 280, which was enacted in 1954, delegated part of the federal government's criminal and civil jurisdiction over Indians to the states. However, Public Law 280 did not delegate to the states the power to tax or regulate tribal lands. *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 379, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *see also California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 208, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) ("In [*Bryan*], we interpreted § 4 [of Pub.L. 280] to grant States jurisdiction over private civil litigation involving reservation Indians in state court, but not to grant general civil regulatory authority.") As the Tribe points out, the CZMA is clearly a "regulatory" statute as the Supreme Court has used the term, and therefore unenforceable on Indian land. *See Cabazon Band,* 480 U.S. at 209, 107 S.Ct. 1083 (if a state law "generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation.")

***Siletz Indian Reservation Plan.*** The Siletz reservation was created in 1980. When the BIA issued the Siletz Indian Reservation Plan in January 1980, the only mention of the CZMA was on page 124, where the Plan stated that *trust lands were exempt from the CZMA's application* and that the BIA attempted to cooperate voluntarily with state and local agencies on matters covered by the CZMA (emphasis added). The BIA did not apply the CZMA when it developed a reservation plan for the Tribe, even though the Plan was developed under a "statutory responsibility" imposed on the agency and creation of the reservation involved the acquisition of land.

Finally, the Tribe argues that canons of statutory construction governing Indian matters support the assertion that the CZMA was not intended to apply to it. It

cites the canon that ambiguities in statutes affecting Indians must be interpreted in favor of the Indians, especially when interpreting statutes that will result in infringement of inherent tribal sovereignty, as is the case here. *See, e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)(Court will "tread lightly in the absence of clear indications of legislative intent"); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–144, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)("Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.")

The crux of the Tribe's argument is that if Indian trust land is exempted from the application of the CZMA, as is land over which the federal government has discretion, (which the Secretary of Interior has with land that has been conveyed pursuant to 25 U.S.C. § 465) then the CZMA cannot apply to the process that led to the establishment of the Indian trust land.

▪ I agree with the Tribe that Indian tribal lands, including land that is taken in trust for Indian tribes, are exempted from the requirements of the CZMA. However, it does not necessarily follow that the *process* by which land taken into trust for the benefit of a Tribe is exempt from the requirements of the CZMA, because the process, in this case at least, was an agency action which affected a coastal zone.

Interior points out that when a state develops its coastal management plan, and that plan is approved by the Secretary of Commerce, the CZMA requires any federal agency activity which affects coastal zones to be consistent to the maximum extent practicable with the state's coastal management plan. Interior asserts that the legislative history of the CZMA suggests no exception to this requirement for

any federal agency, even those acting on behalf of or in concert with Indian tribes. Interior also points out that because *tribes* are not required to submit consistency determinations, the CZMA does not constitute an abrogation of treaty rights or otherwise affect the sovereign status of Indian tribes. Thus, while the CZMA affects the capacity of a federal agency to undertake an activity for the benefit of a tribe, it does not affect a tribe's inherent sovereignty. I find this reasoning persuasive, and conclude that the federal agency is subject to the CZMA, even though the tribe is not.

▪ However, Interior contends that the City cannot maintain its claim under the CZMA because the requirements of the CZMA have now been complied with. I agree. The BIA has made a consistency determination and submitted it to the appropriate state authority; that state authority has also signed off on the consistency determination.

In summary, 1) the CZMA has no applicability to Indian tribes or to Indian land held in trust by the government; 2) the CZMA applies to any action taken by a federal agency which might affect coastal zones, including a fee-to-trust transfer; and 3) the BIA has complied with the requirements of the CZMA because it has made a consistency determination and submitted the determination to the appropriate state authority, and the state authority has approved it. The City has no further part to play in this process, having offered its comments to the DLCD and to the BIA. The CZMA requires only what has already happened: the federal agency has made a consistency determination, affected local governments have had an opportunity to comment, and the state agency responsible for CZMA compliance has approved the BIA's compliance determination. The City's claim under the CZMA is dismissed.

**4. Tribe's motion for summary judgment on claims one, four, five and six and on its fourth counterclaim and Interior's motion for summary judgment on all claims.**

Between them, these motions apply to the remainder of the City's claims. The claims challenged here deal primarily with review of the BIA's decision.

The City's first claim is that the BIA conducted an "inadequate and improper" evaluation of the Tribe's application under the APA. Claim two is that the BIA failed to perform an adequate evaluation of the application under NEPA. Claim three is that the BIA failed to perform an adequate evaluation of the application under the CZMA. Claim four is that the BIA violated 43 C.F.R. 4.1(b)(2) and 4.20 by considering a portion of the Tribe's business plan containing financial information which it refused to provide to the City under the Freedom of Information Act. Claim five is that the BIA should have issued a conditional approval of the transfer. Claim six is that 25 U.S.C. § 465 is an unconstitutionally broad delegation of power from Congress to the executive branch.

***Standard of review***

The Administrative Procedures Act, 5 U.S.C. § 702 ("APA"), grants federal court standing to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." The Supreme Court has interpreted this provision to require that the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ The APA is the sole means for challenging the legality of federal agency action unless "a party challenges an agency action as violating a federal law ... that has been interpreted as conferring a private right of action, or where a particular regulatory scheme contains a specialized provision for obtaining judicial review of agency actions under the scheme." *Clouser v. Espy,* 42 F.3d 1522, 1528 n. 5 (9th Cir.1994); *Hoefler v. Babbitt,* 139 F.3d 726 (9th Cir.1998).

■ Under the APA, an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see In re Transcon Lines,* 89 F.3d 559, 563 (9th Cir.1996). This standard also applies to an agency's interpretations of its own regulations. *Neighbors of Cuddy Mountain v. USFS,* 137 F.3d 1372 (9th Cir.1998).

An agency acts arbitrarily and capriciously if it relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter the evidence before the agency, or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Alvarado Comm. Hosp. v. Shalala,* 155 F.3d 1115, 1122 (9th Cir.1998); *United States v. Snoring Relief Labs, Inc.,* 210 F.3d 1081, 1085 (9th Cir.2000). Deference is given to the agency, with a presumption that the agency's decisions are valid. *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); see also *Ass'n of Pub. Agency*

*Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir.1997).

The factors the BIA must consider in a fee-to-trust transfer are set out at 25 C.F.R. §§ 151.10, 151.11. In this case, the BIA determined that the Property was "off-reservation;" the factors which govern taking "off-reservation" property into trust are set out at 25 C.F.R. § 151.11. The Tribe contests the BIA's finding that the Property was to be considered "off-reservation;" that issue is discussed below, under the Tribe's counterclaim four.

For off-reservation acquisitions, the Secretary must consider the following:

(a) The criteria listed in 25 C.F.R. § 151.10(a) through (c) and (e) through (h), which include the existence of statutory authority for the acquisition; the tribe's need for additional land; the purposes for which the land will be used; the impact on the state and its political subdivisions resulting from the removal of the land from the tax rolls; jurisdictional problems and potential conflicts of land use which may arise; whether the BIA is equipped to discharge additional responsibilities resulting from the acquisition of the land; and the extent to which the applicant has provided information which allows the Secretary to comply with NEPA and hazardous substances determinations;

(b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, with greater scrutiny being given to the tribe's justification as the distance between the reservation and the land to be acquired increases;

(c) When land is being acquired for business purposes, the tribe must provide a plan which specifies anticipated economic benefits associated with the proposed use;

(d) The Secretary must notify state and local governments with regulatory jurisdiction over the land to be acquired that they have 30 days in which to provide written comments on the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

25 C.F.R. § 151.10–11. The policy under which off-reservation land is to be acquired in trust status is set out at 25 C.F.R. § 151.3, and includes: 1) whether the property is located within the reservation or adjacent to it, or within a tribal consolidation area; 2) whether the tribe already owns an interest in the land to be acquired; and 3) whether the acquisition of the land is "necessary to facilitate tribal self-determination, economic development, or Indian housing."

The administrative record shows that the BIA considered these factors. The Tribe and Interior argue that all the BIA was legally required to do was consider these factors and arrive at conclusions supported by the evidence. They assert that the City's various claims really constitute a request that the court review the BIA's decision *de novo* and substitute its own judgment for that of the BIA.

### Claim one

This claim has nine subparts, each of which pertains to a specific defect in the BIA's decision or in its decision-making process.

█ The first subclaim is that the BIA evaluated the Tribe's application with a particular use (the housing development) in mind, but gave the application unconditional approval, leaving the Tribe free to substitute some other use in the future. The City asserts that it was "not sufficient for the BIA only to consider the use of the land that the tribe is currently proposing." Memorandum, page 14. The City does not explain what evidentiary basis the BIA could have used for considering potential

uses other than the one actually proposed by the Tribe. Moreover, the City acknowledges that both the BIA and the IBIA found that the Secretary of the Interior does not have the authority to impose restrictions on a Tribe's future use of property taken into trust, or to acquire fee-to-trust property conditionally. I am not persuaded that the BIA acted arbitrarily or capriciously when it approved the fee-to-trust transfer on the basis of a detailed plan for a housing development rather than on speculation about other possible uses the Tribe might be considering, or changes in the use of the Property which might occur in the future. The Tribe and Interior are entitled to summary judgment on this subclaim.

The second subclaim is that the BIA was required to consider the distance between the Property and the Tribe's reservation, giving greater scrutiny to the Tribe's justification of the transfer, and greater weight to the City's concerns, as the distance from the reservation increased. The City has not responded to the motion for summary judgment with respect to this subclaim. I will assume, therefore, that the City has conceded that summary judgment is appropriate.

Subclaim three is based on the Secretary of Interior's interpretation of 25 C.F.R. § 151.3(a)(3).The City contends that the Secretary has interpreted that regulation to require that the land be "essential" to facilitate tribal self-determination, economic development, or Indian housing, but that the BIA made no such finding.

Interior and the Tribe argue that the interpretation relied upon by the City is an outdated one, drafted 14 years before the current regulations were adopted by the BIA. Under the current regulation, 25 C.F.R. § 151.3(a)(3), the BIA is only required to determine that the land to be acquired is "necessary" to facilitate tribal

self-determination, economic development, or Indian housing, which the BIA did. Even if there were a meaningful distinction to be made between "essential" and "necessary," I would not find it significant when applying an "arbitrary and capricious" standard of review. The defendants are entitled to summary judgment on this subclaim.

 Subclaim four involves the question of whether the BIA considered jurisdictional problems and potential conflicts of land use. The City argues that the record before the BIA did not indicate whether the Tribe intended to adopt its own criminal code for the Property; whether the Tribe would agree to provide its own law enforcement personnel for the Property; or whether the Tribe would agree that the City's law enforcement personnel would have jurisdiction on the Property. The City asserts that the absence of such information precluded the BIA from proper consideration of jurisdictional problems, since the result of the fee-to-trust transfer is that the City's criminal laws would have no application, and the City's police force no jurisdiction over the Property absent an agreement with the Tribe.

However, Interior argues that the BIA is not required by regulation to ensure that the Property and neighboring non-trust properties are subject to identical jurisdictional frameworks, or even to establish what the ultimate jurisdictional framework would be. The regulations only require that the BIA undertake an evaluation of potential problems. Interior asserts that the BIA considered the City's and the Tribe's comments, noted that the State of Oregon would have full criminal jurisdiction over the property, and "considered the practical consequences of similar jurisdictional situations on other tribal lands." Interior's Reply Memorandum, p.

4. On the basis of this evaluation, the BIA found it unlikely that there would be a significant gap in law enforcement coverage which would have a negative effect on residents of the Property.

I am not persuaded that, under an arbitrary or capricious standard, the BIA can be faulted for inability or failure to resolve all potential issues of criminal jurisdiction between tribal and non-tribal areas. The defendants are entitled to summary judgment on this issue.

■ Subclaim five is based on the requirement at 25 C.F.R. §§ 151.10(e) and 151.11(a) that the BIA consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls." The City asserts that if the Property is developed as planned by the Tribe, the development will require City services, but the cost of those services will not be paid from property taxes because the Property is exempt from local and state property taxes. The City also argues that the BIA had no way of properly considering the tax impact because the BIA had no information about how many of the Property's residents would be tribal members and whether mobile homes, leasehold interests or other personal property held by non-Indians on the Property could be taxed. The City contrasts the PUD proposed by the previous owner of the Property and approved by the City which would have netted the City substantial revenues from property taxes.

The Tribe points out that the regulations require the BIA to "consider" this factor, but the regulations do not require the Tribe to agree to reimburse the City for revenues that might be lost due to a fee-to-trust transfer, and do not require the BIA to deny the application for a fee-to-trust transfer merely because a potential impact exists. I agree.

The BIA satisfied its obligation to consider the impact of the removal of the Property from the tax rolls, particularly in light of the federal and state policies supporting tax exemption for trust property and Indian tribes. The City's position would require the BIA to speculate about revenues the Property might have generated for the City had the PUD been developed as originally planned, compare these hypothetical revenues to equally hypothetical losses that might result from the fee-to-trust transfer, and then deny the application on that basis. The BIA had no means of determining whether the residents of the Property would be Indians, non-Indians, or both, whether all the housing would be built, or whether the housing will be mobile homes, manufactured houses, or permanent dwellings. I am not persuaded that the BIA could have done, or should be required to do, a more concrete analysis when so many contingencies are involved.

■ Subclaim six is also under the regulatory requirement that the BIA consider "[j]urisdictional problems and potential conflicts of land use which may arise." The City points out that the development of 144 single family dwellings on the Property will have a substantial impact on the traffic safety of Highway 101, particularly the Highway 101/Neotsu Drive intersection, and contends that because the Tribe's only commitment so far has been that it will negotiate with the Oregon Department of Transportation about moving the intersection and contributing toward Highway 101 improvements, the BIA had no basis for assuming that there would be no land use conflicts. (The City had obtained a commitment from the previous owner of the Property to move the intersection at its own expense and to contribute a specific amount per housing unit for Highway 101 improvements.)

However, as the Tribe points out, the regulations require only that the BIA consider "potential conflicts of land use." They do not require the BIA to resolve conflicts that might arise or to oversee negotiations or to enforce specific commitments on potential conflicts. The Tribe has agreed to negotiate, and there is no indication that the Tribe made that agreement in bad faith.

The City has not briefed arguments on subclaims seven and eight. I therefore treat the defendants' motion for summary judgment as having been conceded with respect to these two subclaims.

Subclaim nine is further divided into six subsections challenging various BIA findings on the ground that they are not supported by the record. I have reviewed these subsections of the subclaim and conclude that they are without merit. The court's obligation is not to engage in *de novo* review to satisfy itself that the agency made the correct decision, but only to ascertain that the decision made was based on rational consideration of the statutorily relevant factors.

### Claim Two

The City asserts that the BIA performed an inadequate and improper evaluation of the Tribe's application under NEPA. The BIA reviewed an Environmental Assessment ("EA") prepared by the Tribe and issued a Finding of No Significant Impact ("FONSI"). Because of the FONSI, the BIA did not require preparation of a full Environmental Impact Statement ("EIS").

 The standard for judicial review of agency action under NEPA is the same standard articulated at 5 U.S.C. § 706(a)(A) and discussed above. The court is not permitted to substitute its judgment for that of the agency regarding environmental consequences of the agency's actions. *Association of Pub. Agency Customers*, 126 F.3d at 1183. Rather, the

court must simply "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.*

The City asserts that the BIA's FONSI, based on the Tribe's EA, is arbitrary and capricious first because the BIA failed to consider other possible uses for the property and second because although the transfer will have an adverse impact on Highway 101, the mitigation measures the Tribe proposes are merely undertakings that are not legally enforceable against the Tribe. I do not find either of these arguments persuasive.

When considering a claim that an EA is flawed, the court must ordinarily "defer to the informed discretion of the responsible federal [agency]." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Deference is accorded agency environmental determinations not because the agency possesses substantive expertise, but because the agency's decisionmaking process is accorded a "presumption of regularity." *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1146 (9th Cir.2000).

NEPA does not set out substantive environmental standards; rather it establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The statute is "primarily procedural." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir.2000). NEPA does not require that agency officials be subjectively impartial. *Id.* at 1142. NEPA does require, however, that projects be objectively evaluated. *Id.* NEPA "assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to ensure that

there is no way the decisionmaker can fail to note the facts..." *Id.* A successful challenge, then, requires the plaintiff to demonstrate that the agency failed to "articulate a rational connection between the facts found and the conclusions made." *Akiak Native Community,* 213 F.3d at 1146, quoting *Oregon Natural Resources Council v.Lowe,* 109 F.3d 521, 526 (9th Cir.1997). I am not persuaded that the City has carried this burden, because I find no clear error of judgment and sufficient indications that the BIA's decision was based on a consideration of the relevant factors. *See Akiak Native Community,* 213 F.3d at 1146.

 The BIA is permitted to rely on the Tribe's representations that it would undertake mitigation measures. NEPA does not *require* a discussion of mitigation strategies in an EA, much less specific, obligatory mitigation measures. *Id.* at 1147(emphasis in original); see also *Robertson,* 490 U.S. at 359, 109 S.Ct. 1835 ("NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts.") (emphasis in original). Nor was BIA required to consider uses of the Property not identified by the Tribe. See, e.g., *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974) ("The range of alternatives that must be considered need not extend beyond those reasonably related to the purposes of the project.") (*quoted in Akiak Native Community,* 213 F.3d at 1148). Moreover, if the Tribe decided to put the Property to some other use, it would still have to comply with NEPA (*i.e.,* generate an EA or an EIS) before it could do so. Interior's motion for summary judgment on claim two will be granted.

### Claim three

Claim three is that the BIA conducted an inadequate and improper evaluation of the Tribe's application under the CZMA.

As discussed above, I have concluded that the CZMA claims should be dismissed on other grounds. However, I also find that the City has made no showing that the BIA's action with respect to the CZMA was arbitrary or unreasonable. The defendants are entitled to summary judgment on this claim.

### Claim four

 The City asserts that the BIA violated 43 C.F.R. § 4.24(a)(4) by basing its decision, in part, on financial information contained in the Tribe's business plan which the BIA refused to provide to the City.

When the Tribe submitted its application to the BIA, it provided the BIA with a business plan which included two pages of financial information. The City sought access to this business plan and was provided with everything except the two pages of financial information. The BIA's regulation requiring the Tribe to submit a business plan as part of its fee-to-trust application specifically provides, "It should be noted that certain confidential business information would be exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552." 60 Fed.Reg. 32,876–77. The City filed a Freedom of Information Act ("FOIA") appeal, which was denied by the FOIA Appeals Director. The Appeals Director found that the two pages of the business plan were properly withheld under exemption (4) of FOIA because they were privileged and confidential financial information provided by an individual. He further found that release of the information could cause competitive harm to the Tribe. The City did not seek judicial review of that decision. Later, however, in its appeal to the IBIA, the City raised the issue of its lack of access to the financial information in the business plan. The IBIA noted the City's failure to seek judicial review and refused to hold that the

Area Director erred in relying on the Tribe's plan without providing it to the City when the City did not pursue its right to judicial review.

The City asserts that because it was not given access to the Tribe's financial information, the BIA's decision should be set aside. However, under the BIA's regulations, the City never had a right to disclosure of that financial information. Even if it did, I agree with the defendants that the City has waived this argument by its failure to seek judicial review of the FOIA appeal.

### Claim five

The City argues that the BIA should not have granted an unconditional fee-to-trust transfer. However, I find no indication that the BIA has the authority to accept land in trust with conditions. The City argues that the BIA should have reviewed the range of "reasonably probable developments a tribe might pursue on a site." City's Memorandum, p. 24. This argument is unpersuasive. The Tribe's application for the fee-to-trust transfer was premised on its intention to develop housing and a detailed description of why and how the Tribe intended to do so, and the BIA's approval was based on that proposed use for the property. I can ascertain no evidentiary or legal basis under which the BIA have hypothesized other "probable" uses to which the Tribe could put the property and then either accepted or rejected the transfer on the basis of these hypothetical uses.

The City asserts in claim five that alternatively, the BIA could have reviewed "a narrower range of developments" (not specified), or even the single proposal made by the Tribe, and made the deed transferring the Property in trust to the United States subject to a reversion of title should the Tribe decide to commence a different project on the Property. The City argues that "[s]ince the BIA did not

so condition the transfer, the BIA's decision was not in accord with the law." Memorandum, page 24. However, the City has not cited authority for the argument that the BIA could or should accept fee-to-trust transfers on condition of such reversions of title. The defendants are entitled to summary judgment on claim five.

### Claim six

 The City asserts in this claim that Section 5 of the IRA, 25 U.S.C. § 465, is an unconstitutionally broad delegation of authority from Congress to the Executive. The City's argument relies on an Eighth Circuit case, *State of South Dakota v. United States Dept. of Interior*, 69 F.3d 878 (8th Cir.1995). However, that case was vacated by the Supreme Court in *United States Dep't of the Interior v. South Dakota*, 519 U.S. 919, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996)(granting certiorari, vacating and remanding to the Secretary of the Interior for reconsideration of administrative decision).

The IRA was enacted in 1934. The Supreme Court has not found a statute unconstitutional on the basis of the nondelegation doctrine since 1935. *See A.L. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). In *United States v. Roberts*, 185 F.3d 1125, 1136–37 (10th Cir.1999), the Tenth Circuit rejected the argument that § 465 unconstitutionally delegates standardless authority to the Secretary. The defendants are entitled to summary judgment on this claim.

### Tribe's counterclaim four

In counterclaim four, the Tribe asserts that the Property should have been considered "onreservation" property for purposes of BIA consideration rather than "off-reservation" property. The BIA

treated the Property as "off-reservation" under 25 C.F.R. § 151.11, and the Tribe asserts that the BIA erred in doing so.

Under 25 C.F.R. § 151.3(a), land need only be located within the exterior boundaries of the Tribe's reservation or adjacent to them in order to be acquired in trust; if the land is not within or adjacent to the boundaries of the reservation, the BIA must determine that acquisition of the land is necessary to facilitate tribal self-determination, economic development, or tribal housing before it can acquire it in trust. Thus, land that is within or adjacent to the reservation carries with it a "presumption" that a fee-to-trust transfer will benefit the tribe, while no such presumption exists for off-reservation land.

### Historical background of the Siletz Reservation

The Tribe asserts that "on-reservation" should be construed to mean all the area encompassed by its former reservation-the Siletz or Coast Reservation first established by Executive Order in 1855. This reservation comprised 800,000 acres, but the Siletz tribe shared it with other tribes. In 1865, the Siletz reservation was reduced to about 575,000 acres and divided into two non-contiguous pieces, with the north section called the Siletz Reservation and the south called the Alsea Reservation. In 1875, Congress passed legislation taking away the Alsea Reservation and half of the Siletz Reservation, so that only 1/4 of the original reservation (225,000 acres) remained as the permanent reservation for the Indians living there. This reservation included what is now Lincoln City and the Property.

In 1892, most of the remaining reservation was opened to settlement. The Indians were paid a small amount of money for their land, and were allowed to apply for allotments. The Tribe was terminated in 1954. By that time, their reservation comprised about 2600 acres. The last 2600 acres were sold as part of the termination process.

In 1977, the Tribe was restored by act of Congress. No land was restored to the Tribe at that time, but the Siletz Restoration Act provided for application of 25 U.S.C. § 465 to the Tribe, thus allowing the Secretary of the Interior to acquire land in trust for the Tribe. In 1980, the Siletz Reservation Act was passed, transferring 27 scattered parcels of BLM land to the Tribe as a reservation, to be held in trust status. The total acreage was about 3630, all within Lincoln County.

Since then, the Tribe has acquired some additional parcels of land in trust, mostly in and around the City of Siletz. Many of these parcels, and the Tribe's casino property in Lincoln City, have been declared part of the current Siletz Reservation by Congress.

### Interior's definition of "Indian reservation"

Interior's regulations define "Indian reservation" as follows:

> Unless another definition is required by the act of Congress authorizing a particular trust acquisition, Indian reservation means that area of land over which the tribe is recognized as having governmental jurisdiction, except that, ... where there has been a final judicial determination that a reservation has been disestablished or diminished, Indian reservation means that area of land constituting the former reservation of the tribe as defined by the Secretary.

25 C.F.R. § 151.2(f). It is the last part of this definition-defining Indian reservation to include the former reservation of a tribe whose reservation has been judicially determined to have been disestablished or diminished—that the Tribe relies on in this case.

Looking at the first part of the definition, Indian tribes have "governmental jurisdiction" over a geographic area called "Indian country," which in general means all lands within the boundaries of the tribe's current reservation, and allotments held by the tribe or individual Indians and dependent Indian communities. 18 U.S.C. § 1151; *DeCoteau v. District Court*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Oklahoma Tax Comm'n. v. Chickasaw Nation*, 515 U.S. 450, 453 n. 2, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995)(scattered parcels of trust land constitute "informal" reservation); *Oklahoma Tax Comm'n. v. Sac & Fox Nation*, 508 U.S. 114, 124–25, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).

Turning to the second part of the definition, the Tribe's argument that an Indian reservation can also be considered a former reservation rests in part on a previous version of 25 C.F.R. § 151.2(f). The previous version had provided that *"when the tribe does not have a specific reservation because the former reservation has been disestablished or totally allotted,* Indian Reservation means that area of land constituting the former reservation of the Indian as defined by the Secretary." (Emphasis added). The italicized language was deleted from the current regulation, indicating that even tribes with a specific geographical reservation could still claim the right to a definition of "Indian Reservation" which encompassed their "former reservation."

The issue then becomes how the Secretary has defined "former reservation." The Tribe argues that the definition emerges from two cases in which Indian tribes tried to acquire land in trust status that was within the former reservation of another tribe. The two cases are *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Anadarko Area Director, BIA*, 18 IBIA 169 (1995), *aff'd as Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*, No. Civ. 92–2161–R (W.D.Okla. 1996), *rev'd on other grounds*, 142 F.3d 1325 (10th Cir.1998), *cert. denied*, 525 U.S. 947, 119 S.Ct. 372, 142 L.Ed.2d 308 (1998) and *Kialegee Tribal Town of Oklahoma v. Muskogee Area Director*, 19 IBIA 296 (1991). In those cases, "former reservation" was defined by reference to 25 U.S.C. § 461, which "implicitly but clearly defines an Indian reservation as an area of land created or set apart by treaty or agreement with the Indians, Act of Congress, Executive Order, purchase or otherwise." *See Citizen Band Potawatomi*, 23 Indian Law Reporter at 3186 (district court decision). This conclusion was affirmed on appeal to the Tenth Circuit.

The Tribe argues that under this definition, the former reservation of the Siletz Tribe for purposes of fee-to-trust acquisitions is the geographic area of the original Siletz or Coast reservation established by Executive Order in 1855, and diminished over time. The Tribe contends that this conclusion is strengthened by the similarities between the Siletz Tribe here and the Citizen Band Potawatomi Tribe in the IBIA case. Both tribes had extensive original reservations established by Executive Order or treaty and both had their original reservations completely extinguished as a result of federal action. Both tribes now have current reservations consisting of scattered parcels of trust land. The Tribe argues that its history constitutes a "diminishment" of its original reservation, satisfying that prong of the regulatory definition. (*Citing to Wisconsin v. Stockbridge–Munsee Community*, 67 F. Supp.2d 990 (E.D.Wis.1999)).

The last requirement of the regulatory definition is that there be "a final judicial

determination that a reservation has been disestablished or diminished." 25 C.F.R. § 151.2(f). The Tribe contends that this took place in Court of Claims and Indian Claims Commission decisions holding that the Siletz or Coast Reservation was diminished over time by a sequence of federal actions. *Alcea Band of Tillamooks v. United States*, 103 Ct.Cl. 494, 59 F.Supp. 934 (1945); *Rogue River Tribe of Indians v. United States*, 105 Ct.Cl. 495, 64 F.Supp. 339 (1946).

Finally, the Tribe argues that policy considerations also require the use of the expanded definition here, noting that the fee-to-trust provision of the IRA, 25 U.S.C. § 465, was enacted in large part to remedy the tremendous losses the Indians sustained in the late 1800s and first half of the 1900s. They argue that defining the Tribe's reservation as the original Coast or Siletz Reservation for purposes of fee-to-trust acquisition "serves the purpose of the IRA because it advances restoration of a small portion of the Tribe's original reservation lands." Tribe's Memorandum at p. 47.

Interior takes the position that only the Tribe's *current* reservation lands qualify as "on-reservation." Because all of the Tribe's reservation lands are scattered parcels, with no "exterior" boundary surrounding all of its reservation lands, all of the Tribe's fee-to-trust applications are considered off-reservation by the BIA.

Interior argues that the second part of the regulation was not intended to cover "situations where undisputed changes to reservation boundaries had occurred over time," but only those involving "tribes whose reservations had been significantly allotted or opened to disposal and consequently subject to claims that they had been extinguished." Memorandum in Opposition, p. 3. I do not find this argument particularly persuasive: the history indicates that the Siletz Reservation falls more readily into the latter category than the former.

Interior also argues that the BIA has consistently so interpreted the acquisition regulations in situations involving the Siletz Tribe and other tribes in the Pacific Northwest. Interior points out that many tribes have "endured histories similar to the Siletz Tribe with respect to their reservations." Memorandum, p. 4. But this point was surely obvious to the drafters of the regulation, and the logical inference is that the drafters intended the tribes to put their historical losses to some current advantage.

Interior also opposes the Tribe's motion on the grounds that 1) the Secretary's interpretation of BIA regulations is entitled to deference; 2) and the Tribe failed to exhaust its administrative remedies. Interior acknowledges that the Tribe's application urged that the Property be considered "on-reservation," but argues that after the Regional Director rejected this argument, the Tribe did not challenge the Regional Director's conclusion when it participated in the appeal of the Director's decision to the IBIA. Thus, the issue was not addressed by the IBIA.

The Tribe counters that the statements contained in the Regional Solicitor's Opinion letter are not an interpretation of § 151.2(f) but rather Interior's conclusions about how § 711e affects applications by the Tribe under acquisition regulations; that the Tribe has asserted this claim throughout the proceedings and in any event, exhaustion is not required; and that the BIA has failed to comply with the APA and its own regulations.

The Tribe points out that the Regional Solicitor's Opinion Letter of June 1, 1994, outlines Interior's position on the application and interplay of 25 U.S.C. § 711e of the Siletz Restoration Act and the Tribe's acquisition under 25 C.F.R. § 151.2(f).

The Tribe asserts that the Opinion Letter is merely Interior's legal conclusions, not an interpretation of the statute or the regulations. Further, the Tribe points out that even if the Opinion Letter were considered the agency's interpretation of its own regulations, the agency's interpretation is entitled to deference only "when the language of the regulation is ambiguous." *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000)("deference is warranted only when the language of the regulation is ambiguous. The regulation in this case, however, is not ambiguous... To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

The Tribe argues that if the Opinion Letter is not the agency's interpretation of an ambiguous regulation, it is only entitled to deference if it is an agency rule, an interpretive rule or a general policy statement. But the APA requires that rulemaking follow notice and comment, which did not occur before the Opinion Letter was written.

Although interpretive rules and general policy statements are excluded from the notice and comment requirement, construing the Opinion Letter as such defeats Interior's argument that the Tribe failed to exhaust its administrative remedies with respect to the issue raised by the Opinion Letter. Interpretive rules and policy statements are not subject to the procedural requirements of the APA, such as exhaustion. Moreover, the Tribe points out that Interior's position in the Opinion Letter is inconsistent with the Tenth Circuit's concurrence in the IBIA holding that the nature of the BIA's determination under § 151.2(f) is a legal conclusion subject to de novo review. *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier,* 142 F.3d 1325, 1332 n. 7 (10th Cir.1998).

The Tribe also disputes Interior's argument that it has waived judicial review of this issue. The Tribe asserts that it raised the issue in its initial application and again in its response brief before the IBIA, and that neither the BIA nor the IBIA has ruled against the Tribe on the issue or otherwise indicated a final decision on the matter. Thus, the Tribe argues, "no controversy existed" for the Tribe to appeal or challenge until the City brought this action. In any event, according to the Tribe, exhaustion is not required in cases involving "primarily issues of law, which courts are equipped to handle," and where administrative remedies dealing with issues of law would be a "waste of judicial resources." *Gamboa v. Rubin,* 80 F.3d 1338, 1351 (9th Cir.1996).

Although I think the Tribe has the better arguments, because of my earlier rulings, the Tribe's fourth counterclaim does not affect the outcome of this case. I have upheld the BIA's decision to acquire the Property under the regulations governing off-reservation acquisitions; it would necessarily also be upheld under the regulations for on-reservation acquisitions. The question of whether the Property should have been considered on-reservation or off-reservation raises a number of legal issues whose resolution is not necessary to the adjudication of this case. I will therefore deny as moot the Tribe's motion for summary judgment on its fourth counterclaim.

## CONCLUSION

The Tribe's motion to dismiss claims seven and eight (doc. # 32) is DENIED. Interior's motion to dismiss claims seven and eight (doc. # 52) is GRANTED. Interior's motion for summary judgment on the CZMA claim (doc. # 29) is GRANTED. The Tribe's motion for summary judgment on the CZMA claim (doc. # 47)

is GRANTED. The Tribe's motion for summary judgment on claims one, four, five, and six, and on its fourth counterclaim (doc. # 61) is GRANTED with respect to claims one, four, five and six, and DENIED AS MOOT with respect to the fourth counterclaim. Interior's motion for summary judgment on all claims (doc. # 67) is GRANTED.