982 F.2d 1312
 24 Fed.R.Serv.3d 737
 Lillian McCovey SHERMOEN; Carol Leigh McConnell Ammon;
Leslie Ammon; Elsie McCovey Bacon; Gaylon Robert Bacon;
Joseph K. Bacon; Raymond E. Bacon; George Clifford Bailey,
Sr.; Ethel Mae Blake; Clarann C. (Ragain) Bray; Mary L.
Carroll; Ora Collins; Dennis Costa; Joanne Barbara Wilder
Costa; Barney Alva Curtice; Frank Benjamin Dowd; Gerald
Ieshh Dowd; Kathy Noreen Dowd; Rocky Twa-Gah Dowd; Venola
Dowd; Ollie Roberts Sorrell Foseide; Eileen Renee (Ragain)
George; Frank Gist; Bonita Bacon Green; Janice Marie
Greene; Earl Griffith; Colleen Guido; Dorothy Harriet
Williams Haberman; Richard Lee Haberman; Mary Louise Hall;
Evalina Hoffman; Linda Lee Hoffman; Virginia Howerton;
Martin Kinder; Rachel Louise Knight; Pauline Rogers
Kothman; Axel Roderick Lindgren; Marilyn Kay Lunsford;
Ardith Evelyn McConnell; Howard Duane McConnell; Michael
McConnell; Robert Brian McConnell; Allen McCovey, Sr.;
Beatrice Violet McCovey; Darrell McCovey; Frank Lynn
McCovey; James L. McCovey; Loren Gerhad McCovey; Vada
Norma John McCovey; Vlayn Dene Harvill McCovey; David
Edgar McLaughlin; Thelma Wilma McLaughlin; Gertrude Viola
Mollier; Carol Griffith Moon; Edward Michael Moore; Lena
Isle Nicholson; David O'Neill; Ellen J. O'Neill; Herbert
Lincoln O'Neill; Barbara D. Orcutt; Lawrence E. Orcutt;
Bernice Jean Roubidoux; Darlene Marie Roubidoux; Peggy
Joyce Sanderson; John Denton Simpson, II; Vivian Kay
Simpson; Alberta Sylvia; Maria Eileen Tripp; Georgiana
Trull; Lena Cleveland Wilder; and The Coast Indian
Community of Yurok Indians of the Resighini Rancheria, a
federally recognized tribe, Plaintiffs-Appellants,
v.
The UNITED STATES of America; The United States Department
of Interior, Bureau of Indian Affairs; Manuel Lujan,
Secretary of the Interior; Eddie Brown, Assistant Secretary
of the Interior/Indian Affairs; Ronald M. Jaeger, Area
Director, Sacramento Area Office, Bureau of Indian Affairs;
and Karole Overberg, Superintendent, Northern California
Agency, Bureau of Indian Affairs, Defendants-Appellees,
Dale Risling, Sr.; Robert D. Hostler; Clifford Lyle
Marshall; and John M. Scott, Intervenor
Defendants-Appellees.
 No. 91-16045.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 15, 1992.
Decided Dec. 24, 1992.
 
 Richard B. Thierolf, Jr., Jacobson, Jewett & Thierolf, Medford, OR, for plaintiffs-appellants.
 Barry M. Hartman and Michael J. Malmquist, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Thomas P. Schlosser and Frank R. Jozwiak, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, for intervenor defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: FLETCHER, POOLE and BRUNETTI, Circuit Judges.
 POOLE, Circuit Judge:
 
 I.
 
 1
 Seventy individual Native Americans and the Coast Indian Community of Yurok Indians of the Resighini Rancheria, appellants, seek review of the district court's dismissal of their suit seeking injunctive relief and a declaration that the Hoopa-Yurok Settlement Act violates their constitutional rights. They also appeal the denial of their motion to amend their complaint. We affirm.
 
 II.
 
 2
 On October 31, 1988, Congress enacted the Hoopa-Yurok Settlement Act, Pub.L. No. 100-580, 102 Stat. 2924 (codified at 25 U.S.C. §§ 1300i-1300i-11 (1988)) ("Act"), thereby partitioning a communal reservation on the Klamath and Trinity Rivers in Northern California for the purpose of "resolv[ing] long standing [sic] litigation between the United States, the Hoopa Valley Tribe and a large number of individual Indians." S.Rep. No. 564, 100th Cong., 2d Sess. 1 (September 30, 1988). This litigation's provenience is found in the irruption of white settlers into California following the discovery of gold in 1849, which occasioned attempts by the federal government to "secure the cession by the Indians of their lands," id. at 4, and to immure "the many small tribes or bands of Indians" within a few "small tracts of land." Id. at 2-4.
 
 
 3
 Towards this end, Congress authorized the President in 1853 "to make five military reservations from the public domain in the State of California or the Territories of Utah and New Mexico bordering on said State, for Indian purposes.... Provided, That such reservations shall not contain more than twenty-five thousand acres." Act of March 3, 1853, ch. 104, 10 Stat. 226, 238.[1] Pursuant to this authorization, by Executive Order dated November 16, 1855, President Franklin Pierce established the 25,000 acre Klamath River Reservation, "a strip of territory commencing at the Pacific Ocean and extending 1 mile in width on each side of the Klamath River." 1 Charles J. Kappler, Indian Affairs, Laws & Treaties 817 (2d ed. 1904). Most of the inhabitants of this area "were and have been Yurok Indians, also known as Klamaths." Short v. United States, 486 F.2d 561, 562, 202 Ct.Cl. 870 (1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974). The reservation was not entirely successful, however, as "the Hoopa and other inland tribes refused to move onto this reservation and armed conflict ... continued." S.Rep. No. 564, at 4.
 
 
 4
 Thus Congress, in 1864, passed "An Act to provide for the Better Organization of Indian Affairs in California." Act of April 8, 1864, ch. 48, 13 Stat. 39. This measure empowered the President to:
 
 
 5
 set apart ... at his discretion, not exceeding four tracts of land, within the limits of [California], to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable....
 
 
 6
 Id. at 40. Acting under this authorization, President Ulysses S. Grant issued an executive order on June 23, 1876, formally establishing the Hoopa Valley Reservation, "a 12-mile square tract of land in Northern California, on the last reach of the Trinity River before it joins the Klamath River...." Short, 486 F.2d at 562; see 1 Kappler at 815. Most of the Indians residing in "the Square," as the Hoopa Valley Reservation has been called, "were and have been Hoopa Indians." Short, 486 F.2d at 562.
 
 
 7
 Since the Act of 1864 superseded the Act of 1853 by allowing only four reservations in California, and since the Klamath River Reservation was not one of the authorized reservations, the Klamath River Reservation was held to be abandoned as a reservation. United States v. Forty-Eight Pounds of Rising Star Tea, Etc., 35 Fed. 403, 406 (N.D.Cal.1888). President Benjamin Harrison, in response to this holding, issued an Executive Order on October 16, 1891, which expanded the Hoopa Valley Reservation by adding "a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the Said Hoopa Valley reservation to the Pacific Ocean." 1 Kappler at 815. This "Addition" or "Extension" thus extended the Hoopa Valley Reservation for some forty-five miles along the Klamath River, thereby encompassing the old Klamath River Reservation. The consequence of President Harrison's order "was the creation of an enlarged, single reservation incorporating without distinction its added and original tracts upon which the Indians populating the newly-added lands should reside on an equal footing with the Indians theretofore resident upon it." Short, 486 F.2d at 567.
 
 
 8
 Despite this, it has been an inveterate practice of the Department of the Interior and the Bureau of Indian Affairs (BIA), appellees in this case, to treat the Square and the Addition "as two separate reservations and the Yurok or Klamath Indians and the Hoopa Indians ... as two separate tribes." S.Rep. No. 564, at 7. This treatment included the practice of allocating all revenues from the sale of timber grown on the Square to members of the Hoopa Valley Tribe. The "long standing [sic] litigation" which the Hoopa-Yurok Settlement Act sought to resolve has, in large part, been generated by Indians of the Addition seeking to recoup their share of profits from the previously unapportioned reservation. See Short, 486 F.2d 561. As a result of the first Short case, the federal government began an escrow fund by "sequestering 70 percent of the annual timber income pending the final decision in [that] case." Short v. United States, 661 F.2d 150, 156, 228 Ct.Cl. 535 (1981), cert. denied, 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982). The establishment of this trust account, in turn, led to more litigation, this time brought by the Hoopa Valley Tribe challenging the government's taking of the timber revenues. Hoopa Valley Tribe v. United States, 596 F.2d 435, 219 Ct.Cl. 492 (1979). Suit was also brought challenging the right of the Hoopa Valley Tribe to govern the whole reservation. Puzz v. United States, No. C-80-2908-TEH, 1988 WL 188462, 1990 U.S.Dist. LEXIS 4433 (N.D.Cal. April 8, 1988).
 
 
 9
 In the Hoopa-Yurok Settlement Act, Congress sought to resolve the legal conflicts by: (1) partitioning the reservation into two reservations, designating the Square as the "Hoopa Valley Reservation" and the Extension as the "Yurok Reservation," 25 U.S.C. § 1300i-1; (2) distributing the escrow funds, 25 U.S.C. § 1300i-3; (3) confirming the status of the Hoopa Valley Tribe, and designating the Square or Hoopa Valley Reservation as the reservation to be held in trust for the Hoopa Valley Tribe, 25 U.S.C. § 1300i-1(b) & 7; (4) recognizing and organizing the Yurok Tribe, and designating the Addition or Yurok Reservation as the reservation to be held in trust for the Yurok Tribe, 25 U.S.C. § 1300i-1(c) & 8.
 
 III.
 
 10
 The appellants brought suit against the United States, the Department of the Interior, and the BIA in August 1990, challenging the constitutionality of the Act on a variety of grounds. Appellants assert that, by extinguishing their interest in the Square and conferring exclusive right to the Square on the Hoopa Valley Tribe, the Act effects a taking of property for a non-public purpose and without just compensation in violation of the Fifth Amendment. They also allege a violation of their First Amendment right of freedom of association in that the Act allegedly forces Native Americans of diverse tribal affiliations to associate in a single, politically determined tribe in order to retain their interests and rights in the reservation. See 25 U.S.C. § 1300i-5(d)(3). Appellants also contend that Congress exceeded its constitutional authority to govern the Indian Tribes by dictating tribal membership, forms of tribal government, and means of tribal organization, and by interfering with the sovereignty of the Coast Indian Community of the Resighini Rancheria. Finally, appellants charge that the Act derogates their Fifth Amendment right to equal protection of the law by illegitimately preferring members of the Hoopa Valley Tribe over other Indians of the reservation.
 
 
 11
 Appellants sought declaratory relief, asking the court to declare the statute unconstitutional, to declare that the BIA's implementation of the statute is not in accordance with law in light of the unconstitutionality of the statute, and to construe the consequences under the Act if the appellants were to file a Fifth Amendment claim for compensation. Appellants also sought to enjoin the BIA from implementing the Act, from treating the reservation as other than a single, unified reservation, and from pursuing policies favoring the Hoopa Valley Tribe. Finally, the appellants asked the court to require the BIA to take affirmative steps to protect their rights in the joint reservation and its revenues, and to foster self-government and self-determination.
 
 
 12
 In November 1990, four members of the Hoopa Valley Tribal Council filed an answer in intervention and counterclaimed for slander.[2] The intervenors also raised affirmative defenses, claiming that the complaint failed to state a claim for relief, that the Court lacked subject matter jurisdiction, and that the claims were fatally defective for failure to join the Hoopa Valley Tribe. The United States separately moved for dismissal in December 1990, on the grounds that the Hoopa Valley and Yurok tribes were indispensable parties, and that the Claims Court had exclusive jurisdiction. On May 23, 1991, the district court dismissed the action with prejudice pursuant to Fed.R.Civ.P. 19(b), ruling that the absent Hoopa Valley and Yurok tribes were indeed indispensable parties and immune from suit. On June 27, 1991, in an attempt to circumvent the Hoopa Valley Tribe's sovereign immunity, appellants sought to file a second amended complaint which named as defendants the individual members of the governing council of the Hoopa Valley Tribe. The court denied this motion.
 
 IV.
 
 13
 We review for an abuse of discretion the district court's decision to dismiss the action. Confederated Tribes v. Lujan, 928 F.2d 1496, 1498 (9th Cir.1991). Our analysis under Fed.R.Civ.P. 19 proceeds in two steps. We first ask whether the district court correctly determined that an absent party is "necessary" to the suit. Fed.R.Civ.P. 19(a). If so, and if that party cannot be joined, we then must assess whether the district court correctly found the party " 'indispensable' so that in 'equity and good conscience' the suit should be dismissed." Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.1990) (quoting Fed.R.Civ.P. 19(b)). "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application. The moving party has the burden of persuasion in arguing for dismissal." Id. (citations omitted).
 
 A.
 
 14
 In determining whether a party is "necessary" under Rule 19(a), a court must consider whether "complete relief" can be accorded among the existing parties, and whether the absent party has a "legally protected interest" in the subject of the suit. Id. The district court found that complete relief could be granted, reasoning that if the act were found by the court to be unconstitutional, the appellants would receive "all the relief for which they prayed." This finding is not contested by any of the parties on appeal.
 
 
 15
 The court also found, however, that the absent Hoopa and Yurok tribes had a "legally protected interest in the outcome of this action." Thus, under Rule 19, the absent tribes would be necessary to the action if "the disposition of the action in the [tribes'] absence may as a practical matter impair or impede the [tribes'] ability to protect that interest." Fed.R.Civ.P. 19(a)(2)(i).
 
 
 16
 Appellants challenge the district court's ruling on the grounds that the very existence of the absent tribes' interest depends on the legality of the Act. The appellants' position is not without some logical appeal. The Act is either constitutional or unconstitutional: if the latter, then the absent tribes have no "legally protected interest in the outcome of the action"; if the former, then the appellants will not prevail and thus the disposition of the action will not impair the absent tribes' interests.
 
 
 17
 The language of Rule 19, however, forecloses such an analysis. Under that rule, the finding that a party is necessary to the action is predicated only on that party having a claim to an interest: "A person ... shall be joined as a party in the action if ... the person claims an interest relating to the subject of the action...." Fed.R.Civ.P. 19(a)(2). Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party.
 
 
 18
 Thus, the joinder rule is to be applied so as to preserve the right of parties "to make known their interests and legal theories." Wichita and Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 775 (D.C.Cir.1986). In this case, the absent tribes have an interest in preserving their own sovereign immunity, with its concomitant "right not to have [their] legal duties judicially determined without consent." Enterprise Mgt. Consultants v. U.S. ex rel. Hodel, 883 F.2d 890, 894 (10th Cir.1989). The district court was therefore correct in concluding that the tribes were necessary parties.
 
 
 19
 We do not hold, of course, that a district court would be required to find a party necessary based on patently frivolous claims made by that party. But such is clearly not the case before us; the absent tribes have an indisputable interest in the outcome of appellants' suit, and the Act, which has created that interest, is not so palpably unconstitutional that we could readily say the absent tribes' claims are fatuous. See, e.g., Confederated Tribes, 928 F.2d at 1498 (protecting tribe's "current status as the exclusive governing authority of the reservation").
 
 
 20
 Appellants argue in the alternative that the United States and the intervenors would be capable of adequately representing the interests of the absent tribes. As we noted in Makah:
 
 
 21
 If a legally protected interest exists, the court must further determine whether that interest will be impaired or impeded by the suit. Impairment may be minimized if the absent party is adequately represented in the suit. The United States may adequately represent an Indian tribe unless there is a conflict of interest between the United States and the tribe.
 
 
 22
 910 F.2d at 558. The district court correctly found, however, that this case presents a potential conflict of interest for the United States. While the United States might share the same ultimate goal as the absent tribes, namely that of vindicating the constitutionality of the Act, it is unlikely that the government could sufficiently represent the competing interests and divergent concerns of the tribes, for the government must also act in keeping with its role and obligations as trustee. As was the case in Confederated Tribes, "the United States cannot adequately represent the [absent tribes'] interest without compromising the trust obligations owed to the plaintiff tribes." 928 F.2d at 1500.
 
 
 23
 Nor are the intervenor members of the Hoopa Valley Tribal Council capable of adequately representing the interests of the absent tribes. In assessing an absent party's necessity under Fed.R.Civ.P. 19(a), the question whether that party is adequately represented parallels the question whether a party's interests are so inadequately represented by existing parties as to permit intervention of right under Fed.R.Civ.P. 24(a). Consequently, we will consider three factors in determining whether existing parties adequately represent the interests of the absent tribes: whether "the interests of a present party to the suit are such that it will undoubtedly make all" of the absent party's arguments; whether the party is "capable of and willing to make such arguments"; and whether the absent party would "offer any necessary element to the proceedings" that the present parties would neglect. County of Fresno v. Andrus, 622 F.2d 436, 439 (9th Cir.1980).
 
 
 24
 We do not believe that the district court erred in finding that the absent tribes were not adequately represented by the parties before it. We note initially that, even if the intervenors were capable of representing the Hoopa Valley Tribe, there is no credible claim that they could sufficiently represent the interest of the absent Yurok tribe. In addition, the Act affects the rights of the intervenors as individuals, in addition to benefiting the tribe to which they belong and which appellants would have them represent. Given this potential conflict, we cannot with any certainty conclude that the intervenors would be willing to make all of the arguments of the absent tribe.
 
 
 25
 Consequently, the district court did not abuse its discretion in concluding that the absent tribes were necessary to the adjudication of this case.
 
 B.
 
 26
 The absent tribes, while necessary, cannot be joined due to their sovereign immunity. Thus, we next review the district court's conclusion that the tribes were "indispensable," necessitating dismissal of the complaint under Rule 19(b). This rule requires our analysis to consider four factors:
 
 
 27
 first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 28
 Fed.R.Civ.P. 19(b); see Makah, 910 F.2d at 560. The district court noted that the third and fourth factors favored a finding that the absent tribes were not indispensable, since the court had the power to grant the relief sought by the appellants even in the absence of the other tribes, and because dismissal of the action would leave the appellants without a forum in which to present several of their claims. The court concluded, however, that the first and second factors, which heavily favored a finding of indispensability, outweighed the third and fourth factors, and consequently dismissed the action. We agree with the district court's analysis, as well as the conclusion that the absent tribes could suffer severe prejudice should the appellants' claims succeed.
 
 
 29
 Appellants argue that despite the potential for prejudice to the absent tribes, the action should be permitted to proceed under the "public rights" exception to the traditional joinder rules. See 3A James William Moore, Moore's Federal Practice p 19.07, at 19-100-101, 133-137 (2d ed. 1991) ("In actions involving public rights, for example, the fact that a third party may be adversely affected by the litigation is insufficient in itself to justify treating him as an indispensable party"). In Makah, 910 F.2d at 559 n. 6, we suggested that the public rights exception to joinder rules might be applicable when an absent tribe is necessary to adjudication of claims. In this case we agree with the appellants that some of the interests they seek to vindicate, like the interest in being governed by constitutional laws, are public rights. Cf. Makah, 910 F.2d at 559 ("[A]ll of the tribes have an equal interest in an administrative process that is lawful."). But, the public rights exception to joinder rules is an acceptable intrusion upon the rights of absent parties only insofar as the "adjudication[ ] do[es] not destroy the legal entitlements of the absent parties." Conner v. Burford, 848 F.2d 1441, 1459 (9th Cir.1988) (citing National Licorice Co. v. NLRB, 309 U.S. 350, 366, 60 S.Ct. 569, 578, 84 L.Ed. 799 (1940)), cert. denied, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). Because of the threat to the absent tribes' legal entitlements, and indeed to their sovereignty, posed by the present litigation, application of the public rights exception to the joinder rules would be inappropriate.
 
 V.
 
 30
 We review for an abuse of discretion the district court's denial of leave to amend after responsive pleadings have been filed. Roth v. Garcia Marquez, 942 F.2d 617, 628 (9th Cir.1991). The denial is, however, " 'strictly' reviewed in light of the strong policy permitting amendment." Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1991) (quoting Moore v. Kayport Package Express, 885 F.2d 531, 537 (9th Cir.1989)).
 
 
 31
 Following the dismissal of their complaint, appellants sought leave of the court to file an amended complaint joining all the officers of the Hoopa Valley Tribal Council as defendants. The district court denied the appellants' motion, finding that "there was no possibility of stating a cause of action taking away something over which the tribes have sovereign immunity." If this finding was correct, the dismissal would not be an abuse of discretion, for "[a] district court does not err in denying leave to amend where the amendment would be futile." DeSoto v. Yellow Freight Systems, Inc., 957 F.2d 655, 658 (9th Cir.1992).
 
 
 32
 Appellants premise their amended complaint on our holding in Burlington Northern v. Blackfeet Tribe, 924 F.2d 899 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3013, 120 L.Ed.2d 887 (1992), which observed that:
 
 
 33
 sovereign immunity does not extend to officials acting pursuant to an allegedly unconstitutional statute.... [T]ribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law.
 
 
 34
 924 F.2d at 901. Despite the broad dicta of Burlington Northern, we do not agree that an officer's suit could be maintained under the circumstances of this case. Although the amended complaint names individual tribal council members as defendants, it is clear from "the essential nature and effect" of the relief sought that the tribe "is the real, substantial party in interest." Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The Supreme Court has instructed that:
 
 
 35
 The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," Land v. Dollar, 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704 [69 S.Ct. 1457, 1468, 93 L.Ed. 1628] (1949).
 
 
 36
 Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The real party in interest in the amended complaint is therefore the sovereign tribe; indeed, were it not so, the amended complaint would not remedy the lack of adequate representation which necessitated dismissal of the complaint in the first place. It is true that officer's suits have been permitted in the past when "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional."[3] Larson, 337 U.S. at 690, 69 S.Ct. at 1461. But, at the same time:
 
 
 37
 a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.
 
 
 38
 Id. at 691 n. 11, 69 S.Ct. at 1462 n. 11. As we explained in State of Washington v. Udall, 417 F.2d 1310 (9th Cir.1969), this means that:
 
 
 39
 the purposes for the doctrine of sovereign immunity may be controlling in some suits against officers so that the suits must be dismissed as suits against the Government, even though the officers were not acting pursuant to valid statutory authority, because the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm. In such cases a party must be denied all judicial relief other than that available in a possible action for damages.
 
 
 40
 Id. at 1318. The relief sought in this case would prevent the absent tribes from exercising sovereignty over the reservations allotted to them by Congress. It is difficult to imagine a more "intolerable burden on governmental functions." We conclude that the relief sought by the proposed amended complaint would have impermissibly infringed upon the sovereign immunity of the absent tribes. As a result, the amended complaint could not have eliminated the necessity of securing the presence of the absent tribes, and the district court thus committed no error in dismissing the case.
 
 
 41
 We realize that our decision effectively denies appellants a forum in which to have some of their grievances heard. This case serves as one more illustration, however, that "Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly restrained." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978). Appellants' relief, if any is available, must be sought in the forum envisioned by Congress--namely, the Court of Claims. See 25 U.S.C. § 1300i-11.
 
 
 42
 The orders of the district court dismissing the complaint and denying leave to amend the complaint are AFFIRMED.
 
 
 
 [1]
 The Act was subsequently amended to provide for two additional reservations. Act of March 3, 1855, ch. 204, 10 Stat. 686, 699
 
 
 [2]
 The counterclaim was later voluntarily dismissed
 
 
 [3]
 We assume, without deciding, that the unconstitutional acts alleged by appellants would suffice to state a claim against the officers of an Indian tribe. But see Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 1675-76, 56 L.Ed.2d 106 (1977) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority.")