The UNITED KEETOOWAH BAND
OF CHEROKEE INDIANS OF
OKLAHOMA, Plaintiff,

v.

The UNITED STATES, Defendant,

and

The Cherokee Nation, Defendant–
Intervenor.

No. 03–1433L.

United States Court of Federal Claims.

Sept. 16, 2005.

Michael G. Rossetti, Washington, DC, for plaintiff.

James M. Upton, U.S. Department of Justice, Washington, DC, with whom was Kelly A. Johnson, Acting Assistant Attorney General for defendant.

Lloyd B. Miller, Washington, DC, for defendant-intervenor.

## OPINION

FIRESTONE, Judge.

Pending before the court is a motion to dismiss by limited-intervenor Cherokee Nation of Oklahoma ("Cherokee Nation" or "Nation") for failure to join an indispensable party pursuant to Rule 19 of the Rules of the United States Court of Federal Claims ("RCFC") or for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Both the plaintiff, the United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB") and the defendant, the United States ("government" or "United States") oppose the Cherokee Nation's motion. For the reasons that follow, the Cherokee Nation's motion is **GRANTED**.

## BACKGROUND

The following facts, unless otherwise noted, are taken from the plaintiff's complaint and have been accepted as true. The Cherokee Indians originally lived in the southeastern portion of the United States on lands forming present day Georgia, Alabama, Tennessee, North Carolina, and South Carolina. Early treaties between the Cherokees and the United States established the boundaries of the historic Cherokee Nation in these southeastern lands. Through a treaty in 1817, the United States ceded lands adjacent to the Arkansas and White Rivers to the Cherokees in exchange for a portion of the Cherokee lands in the East. One third of the Cherokees emigrated to the new Arkansas and White River lands, but the others chose to remain in the eastern lands.

Through further treaties in 1828 and 1833, the United States granted the Cherokees approximately 7 million acres of land running along the Arkansas, Canadian, and Grand Rivers. In 1835, the United States and the Cherokees entered into the Treaty of New Echota, which granted the Cherokee an additional 800,000 acres and required the Cherokee Nation to cede all of the eastern lands and move all of its members to the lands west of the Mississippi River. The treaty also provided that the lands ceded to the Cherokee Nation by the 1828, 1833, and 1835 treaties "shall all be included in one patent executed to the Cherokee nation of Indians by the President of the United States" and that the "Cherokees ... shall also be protected against interruption and intrusion from citizens of the United States, who may attempt to settle in the country without their consent; and all such persons shall be removed from the same by order of the President of the United States." Treaty with the Cherokee (Treaty of New Echota), Dec. 29, 1835, U.S.-Cherokee, art. III, art. VI, 7 Stat. 478, 480, 481.

The Cherokees who had settled in the lands west of the Mississippi objected to the Treaty of New Echota, but the eastern Cherokees were forcibly removed from the eastern lands and placed on the western lands. Differing factions of the Cherokees fought over political power and governmental authority. In 1846, the United States attempted to resolve the dispute over governmental authority through another Treaty, which provided that the lands ceded in the Treaty of New Echota were "secured to the whole Cherokee people for their common use and benefit," Treaty with the Cherokees, Aug. 6, 1846, U.S.-Cherokee, art. I, 9 Stat. 871, 871, and that the Arkansas Riverbed lands ceded in the 1828 Treaty were "intended for the use of, and to be the home for, the whole nation." *Id.* at art. 4, 9 Stat. at 873.

In 1859, a group of western Cherokees formed the "Keetowah Society." UKB claims that it is a successor of this group. In 1902 Congress enacted legislation establishing a system to terminate the collective holding of Cherokee lands by allotting the lands to the individual Cherokee Indians. Act of July 1, 1902, Pub.L. No. 57–241 § 11. To this end, a roll of Cherokee citizens as of September 1, 1902 was also established. *Id.* at § 25. The legislation further provided that the Cherokee tribal government would be terminated on March 4, 1906. *Id.* at § 63. However, the lands were never allotted, and in 1906 Congress provided that the unallotted lands of the Cherokee tribe and other tribes "shall be held in trust by the United States for the use and benefit of the Indians respectively comprising each of said tribes, and their heirs ...." Act of April 26, 1906, Pub.L. No. 59–129 § 27, 34 Stat. 137, 148.

The Act also provided that each tribe would have a Principal Chief appointed by the President of the United States. Such Principal Chiefs for the Cherokee Nation were periodically appointed by the President, although during one period of time the office was left vacant for nineteen years.

After Congress passed the Oklahoma Indian Welfare Act, 25 U.S.C. §§ 501–509, ("OIWA") in 1936, the Keetoowah Society sought to organize as a separate entity in order to receive benefits under OIWA. In 1946, Congress enacted legislation recognizing the Keetoowah Indians as "a band of Indians residing in Oklahoma," allowing the band to receive benefits under OIWA. Act of Aug. 10, 1946, Pub.L. No. 79–715, 60 Stat. 976. The Cherokee Nation adopted a constitution in 1976, but the tribe has never been organized under OIWA. In 1970, the United States Supreme Court determined that the Treaty of New Echota conveyed title to all lands within its metes and bounds description, including the banks and bed of the Arkansas River, to the Cherokee Nation. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 634–35, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

In 1989, the Cherokee Nation filed an action in this court alleging that the federal government had mismanaged the Arkansas Riverbed lands held in trust for the Cherokee Nation. The Choctaw and Chickasaw Nations, who claimed other portions of the Arkansas Riverbed, also filed suit alleging government mismanagement of lands held in trust In 2002, UKB moved to intervene in the proceedings, arguing that UKB was "a successor in interest" to the historic Cherokee Nation. This court denied the motion to intervene on the ground of untimeliness. *Cherokee Nation of Oklahoma v. United States,* 54 Fed.Cl. 116 (2002).

In December 2002, Congress enacted the Cherokee, Choctaw and Chickasaw Nations Claims Settlement Act, Pub.L. No. 107–331, 116 Stat. 2845 (2002) (codified at 25 U.S.C. §§ 1779–1779g) ("Settlement Act" or "Act"). As described by Congress, the purposes of the Act were to "resolve all claims that have been or could have been brought by the Cherokee, Choctaw and Chickasaw Nations against the United States, and to confirm that the Indian Nations are forever disclaiming any right, title, or interest in the Disclaimed Drybed Lands, which are contiguous to the channel of the Arkansas River ...." 25 U.S.C. § 1779a. The Settlement Act states:

> Pursuant to their respective tribal resolutions, and in exchange for the benefits conferred under this subchapter, the Indian Nations shall, on the date of enactment of this subchapter, enter into a consent decree with the United States that waives, releases, and dismisses all the claims they have asserted or could have asserted in their cases numbered 218–89L and 630–89L pending in the United States Court of Federal Claims against the United States, including but not limited to claims arising out of any and all of the Indian Nations' interests in the Disclaimed Drybed Lands [defined in section 1779b(2)] and arising out of construction, maintenance and operation of the McClellan–Kerr Navigation Way.... Upon entry of the consent decree [after all appropriations authorized under this title have been made and deposited into the appropriate tribal trust fund account], all the Indian Nations' claims and all their past, present, and future right, title, and interest to the Disclaimed Drybed Lands, shall be deemed extinguished. No claims may be asserted in the future against the United States ... for actions taken or failed to have been taken by the United States for events occurring prior to the date of extinguishment of claims with respect to the Riverbed.

25 U.S.C. § 1779c(a).

In the Act, the term "Indian Nations" refers to the three Indian tribes who had claims pending in this court: the Cherokee Nation, the Choctaw Nation, and the Chickasaw Nation. 25 U.S.C. § 1779b(3). The term "Riverbed" refers to both the disclaimed drybed lands and the wetbed lands, including all minerals therein, which are the subject of the legislation. 25 U.S.C. § 1779b(4). The Act defines "Drybed Lands" to mean, "those lands which, upon the date of enactment ... lie above and contiguous to the mean high water mark of the Arkansas River in the State of Okla-

homa." 25 U.S.C. § 1779b(2). "Wetbed Lands" is defined to mean "those Riverbed lands which lie below the mean high water mark of the Arkansas River in the State of Oklahoma . . . ." 25 U.S.C. § 1779b(6).

As compensation for settlement of these claims (both for extinguishment of title to the disclaimed drybed lands and for settlement of any mismanagement claims in connection with both the drybed and wetbed lands), the Settlement Act authorizes $40 million in appropriations, $10 million per fiscal year from fiscal year 2004 through fiscal year 2007, for the Indian Nations, with 50%, or $20 million, to be deposited in a tribal trust fund account for the Cherokee Nation. 25 U.S.C. § 1779c(c),(d).

The Settlement Act also extinguishes the title of any other Indian tribe in the disclaimed drybed lands:

> As of the date of enactment of this subchapter—(A) all right, title, and interest of any Indian nation or tribe other than any Indian Nation defined in section 1779b of this title (referred to in this section and section 1779g of this title as a "claimant tribe") in or to the Disclaimed Drybed Lands, and any such right, title, or interest held by the United States on behalf of such a claimant tribe, shall be considered to be extinguished . . . .

25 U.S.C. § 1779f(a)(1)(A).

The Settlement Act further establishes, in addition to the tribal trust fund accounts, "an interest-bearing special holding account for the benefit of the Indian Nations." 25 U.S.C. § 1779f(b)(2)(A). The special holding account is funded by ten percent of the funds "that would otherwise be deposited in a tribal trust account." 25 U.S.C. § 1779f(b)(1)(B). The Settlement Act goes on to provide that:

> Not later than 180 days after the date of enactment of this subchapter, any claimant tribe that claims that any title, interest, or entitlement held by the claimant tribe has been extinguished by operation of section 1779c(a) of this title or subsection (a) of this section may file a claim against the

United States relating to the extinguishment in the United States Court of Federal Claims.

25 U.S.C. § 1779f(b)(1)(A).

If a final judgment in such an action is less than the amount of funds in the special holding account, then the claimant tribe's award will be made from that account and the remainder will be deposited in the tribal trust account for the appropriate Indian Nation. 25 U.S.C. § 1779f(b)(3)(B)(i). If the final judgment exceeds the amount in the special holding account, then the balance of the special holding account will be used to satisfy the judgment, with the additional funds provided by a separate appropriation. 25 U.S.C. § 1779f(b)(3)(B)(ii).

The Settlement Act concludes:

> This subchapter shall not be construed to resolve any right, title, or interest of any Indian nation or of any claimant tribe, except their past, present, or future claims relating to right, title, or interest in or to the Riverbed and the obligations and liabilities of the United States thereto.

25 U.S.C. § 1779g.

UKB filed this action on June 10, 2003, which was within 180 days of the Settlement Act's enactment on December 13, 2002. Count I of UKB's complaint seeks compensation for the extinguishment of all right, title, and interest to the Arkansas Riverbed Lands. Counts II through VI of UKB's complaint seek damages for breaches of the government's fiduciary duties with respect to the Arkansas Riverbed Lands and minerals therein.[1] In its complaint, UKB alleges that the historic Cherokee Nation tribal government, to which the relevant lands were conveyed by the treaties in the 1800's, was terminated by the legislation in 1902 and 1906. UKB further alleges that it is a successor in interest to this historic Cherokee Nation. In their Joint Preliminary Status Report, submitted August 18, 2004, the parties identified the "successor in interest" issue as the "core legal issue" in the case.

---

1. The government disagrees with UKB and the Cherokee Nation regarding the scope of the Settlement Act and whether UKB may bring claims relating to lands other than the disclaimed drybed lands pursuant to the Act. The court agrees with UKB and the Cherokee Nation regarding the scope of the Settlement Act.

On September 7, 2004, the Cherokee Nation moved to intervene on a limited basis, to file a motion to dismiss in this action. The court granted the Cherokee Nation's motion for limited intervention on December 10, 2004. The Cherokee Nation then filed a motion to dismiss for failure to join an indispensable party and for lack of jurisdiction. In its motion to dismiss, the Cherokee Nation argues that as the sole titleholder of all Riverbed lands identified in the Settlement Act, it is a necessary and indispensable party to the present action by UKB that seeks to establish an interest in some of those same lands. The Cherokee Nation also argues that UKB's claims are essentially claims against the Cherokee Nation, a private party, over which this court does not have jurisdiction. Oral argument on the Cherokee Nation's motion to dismiss was held on August 30, 2005.

## DISCUSSION

### A. Standard of Review

The Cherokee Nation has filed a motion to dismiss for failure to join an indispensable party under RCFC 19 or for lack of subject matter jurisdiction under RCFC 12(b)(1). "[I]n passing on a motion to dismiss, ... the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must accept as true the facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). For motions to dismiss for failure to join an indispensable party, the moving party bears the burden of persuasion. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990).

### B. Motion to Dismiss for Failure to Join Indispensable Party

The Cherokee Nation argues that it is both necessary and indispensable to this action, and that therefore the case should be dismissed pursuant to RCFC 19. Under that rule, the court must perform a two-step analysis before dismissing a claim for failure to join an indispensable party. First, the court must determine whether the absent person is "necessary." If an absent party is necessary but cannot be joined, the court must then determine under RCFC 19(b) whether the case should be dismissed. RCFC 19(b) provides that if the necessary person cannot be made a party, the court must determine "whether in equity and good conscience the action should proceed ... or should be dismissed ...." Because it is equitable in nature, "[t]he determination is heavily influenced by the facts and circumstances of each case." *Bakia v. County of Los Angeles*, 687 F.2d 299, 301 (9th Cir.1982).[2]

### 1. The Cherokee Nation Is a Necessary Party

■ As provided for under RCFC 19, the court will first examine whether the Cherokee Nation is a necessary party to an adjudication of UKB's claims. Under RCFC 19(a), a person is "necessary" and shall, if feasible, be joined:

if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

RCFC 19(a).

The Cherokee Nation argues that it claims an interest relating to the subject of the action and that its ability to protect that interest will be impaired or impeded by a disposition in its absence.[3]

---

**2.** RCFC 19 "closely conforms to FRCP [Federal Rule of Civil Procedure] 19" and accordingly this court relies on cases relating to that rule as persuasive authority. RCFC 19 rules committee's note.

**3.** The Cherokee Nation does not argue that complete relief could not be accorded among those already parties. Accordingly, the court does not reach that issue.

### a. Interest

In order to be necessary, a person must "have an interest in the outcome of the *present* litigation that will be prejudiced if [the] case proceeds in its absence." *Brown v. United States,* 42 Fed.Cl. 538, 565 (1998). Furthermore, the interest must be a "legally protected interest . . . more than a financial stake . . . and more than speculation about a future event." *Makah,* 910 F.2d at 558 (citations omitted).

Here, the Cherokee Nation claims that it has an interest, as titleholder, in the Riverbed lands that are the subject of this action. The Cherokee Nation contends that under the terms of the Settlement Act it will continue to hold title to the disclaimed drybed lands until 2007 and that it has not relinquished its title to the wetbed lands of the Riverbed. The Cherokee Nation argues that it must merely claim an interest in the subject of the action; it is not required to establish that interest: "It is the party's *claim* of a protectible interest that makes its presence necessary." *American Greyhound Racing v. Hull,* 305 F.3d 1015, 1024 (9th Cir.2002) (holding that the fact that the party's interest was dependent on the outcome of the litigation did not prevent the party from being considered necessary). "Under [Rule 19], the finding that a party is necessary to the action is predicated only on that party having a *claim* to an interest." *Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992) (rejecting the kind of "circularity" of requiring a party's interest to be established rather than merely claimed). Tested by these standards, the Cherokee Nation contends that it has met the criteria for the "interest" prong of the RCFC 19(a)(2) necessary party test. The court agrees.

**4.** The Cherokee Nation also correctly notes that in the Settlement Act, Congress recognized the Cherokee Nation as a "federally recognized Indian tribe . . . [that] has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union." 25 U.S.C. § 1779(3).

**5.** At oral argument, the court explored with the parties whether UKB's claim could be split between the drybed and wetbed lands, so that UKB's claims relating to the disclaimed drybed

It is generally recognized that a party claiming title to property that is the subject of litigation has an "interest" in that litigation. *See, e.g., Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459 (9th Cir.1994) (holding that the Quinault Indian Nation was a necessary party to an action by the Quileute Indian Tribe challenging a Department of Interior determination that property within the Quinault Reservation escheated to the Nation rather than the Tribe); *Pit River Home and Agric. Coop. Assoc. v. United States,* 30 F.3d 1088, 1099 (9th Cir.1994) (holding that a beneficial owner of the property at issue in the case had a legal interest in the litigation); *Shermoen,* 982 F.2d at 1318 (holding that absent tribes had an interest in the outcome of litigation challenging a statute partitioning lands between the tribes). The Cherokee Nation plainly fits that criteria. The Cherokee Nation rightfully claims that under established precedent, *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 634–35, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), it is the titleholder to both the drybed and wetbed lands that are at issue in this case.[4]

The facts that the Cherokee Nation has disclaimed its interest, effective in the future, in the drybed lands that are the subject of this litigation and has accepted a settlement for the government's alleged mismanagement of the drybed and wetbed lands do not alter this conclusion. At the present time, the Cherokee Nation claims that it is the sole owner of the lands that are the subject of this lawsuit. Moreover, the Cherokee Nation bases this sole ownership interest in the subject lands on the same statutes and treaties that UKB relies upon to establish its interest in the drybed and wetbed lands. Thus, any decision regarding the UKB's interest in the subject lands would directly implicate the Cherokee Nation's interest in the same lands.[5] In this circumstance, then, the Cher-

lands could proceed even in the Cherokee Nation's absence. The court examined whether UKB has some unique interest in the disclaimed drybed lands in light of the Cherokee Nation's agreement to disclaim any interest in those lands after 2007. However, the basis for UKB's alleged interest in the drybed lands and the wetbed lands is the same as the Cherokee Nation's. UKB could not identify any statutes or treaties for claiming an interest in the disclaimed drybed lands that are different from the statutes and

okee Nation has a legally protectable interest in the subject of the litigation with respect to UKB's claim for compensation for extinguishment of its claims against the United States for both the disclaimed drybed lands and for mismanagement of the Riverbed lands.[6]

### b. Ability to Protect Impaired or Impeded

RCFC 19(a) further provides that even if a party has an interest in the litigation, the party must still demonstrate that it is "so situated that the disposition of the action in [its] absence may as a practical matter impair or impede [its] ability to protect that interest" or that a party to the litigation would be subjected to inconsistent obligations. RCFC 19(a)(2)(i). Once again the court concludes that the Cherokee Nation has met its burden.

The Cherokee Nation claims that it holds exclusive title to the drybed and wetbed lands at issue and that it exercises sovereignty over these lands. The Cherokee Nation argues that if the court were to find, for purposes of the Settlement Act, that UKB has an interest in these same lands, then the Cherokee Nation will have difficulty exercising sovereignty or claiming exclusive title over these lands. Thus, the Cherokee Nation argues that the disposition of this case may as a practical matter affect the Cherokee Nation's ability to protect its interests in the lands and its interest in its sovereignty over those lands. UKB and the government argue that the Cherokee Nation's concern can be addressed by incorporating limiting language in the decision in the pending case or by leaving the issue to be addressed in future cases if problems over the Cherokee Nation's sovereignty arise. These are not satisfactory answers. Other courts have rec-

ognized that where there are competing claims to the same property, one party's attempt to litigate the claim may impair or impede the other party's interest in the same property. *See Pit River,* 30 F.3d at 1099; *Keweenaw Bay Indian Community v. Michigan,* 11 F.3d 1341, 1347 (6th Cir.1993) (holding that successor in interest bands of Chippewas were necessary parties to another band's claim of exclusive fishing rights granted "in common to the Chippewas").

For the foregoing reasons, the court concludes that the Cherokee Nation is so situated that as a practical matter its interest in the Riverbed lands may be impaired or impeded by this litigation; accordingly, the court finds that the Cherokee Nation is necessary to UKB's claims regarding these lands.[7]

### 2. The Cherokee Nation is Indispensable

Because the court concludes that the Cherokee Nation is a necessary party to the litigation, it must now decide whether the Cherokee Nation is also an indispensable party. Under RCFC 19(b), if a necessary person cannot be made a party, the court must determine "whether in equity and good conscience the action should proceed ... or should be dismissed ...." Thus, first the court must determine whether the Cherokee Nation can be made a party, and then must consider whether in equity and good conscience the matter should be dismissed. Each determination will be made in turn.

### a. The Cherokee Nation Cannot be Made a Party

The Cherokee Nation argues that it enjoys sovereign immunity as a tribe, and that therefore it cannot be joined as a party with-

---

treaties the Cherokee Nation relies upon for its claim of title to all of the Riverbed lands. In such circumstances, the court's consideration of UKB's alleged interest in the disclaimed drybed lands would necessarily implicate the Cherokee Nation's interests in other lands.

6. Having concluded that the Cherokee Nation has a legally protected interest in the lands that are the subject matter of the litigation, the court does not address whether the Cherokee Nation

also has an interest in the Special Holding Account that was established under the Settlement Act.

7. Having concluded that the Cherokee Nation's ability to protect its interests in the lands would be impeded if it were not a party, the court does not reach the issue of whether disposition of this case would subject the government to inconsistent obligations as identified in RCFC 19(a)(2)(ii).

out its consent. The Cherokee Nation asserts that it has not consented to be sued in this instance, and therefore it cannot be joined as a party in this action.

The government argues that the Cherokee Nation has waived its sovereign immunity with regard to the successor in interest issue through its arguments in its motion to dismiss and that therefore the Cherokee Nation can be made a party to this issue. In its motion to dismiss, the Cherokee Nation argues that re-litigation of the indispensable party issue is barred by collateral estoppel. According to the Cherokee Nation, other cases filed by UKB raising the successor in interest issue were dismissed for failure to join the Cherokee Nation as an indispensable party.

■ The court agrees with the Cherokee Nation that it has not waived its sovereign immunity. Indian tribes enjoy sovereign immunity, subject to the control of Congress, and thus cannot be sued except as it consents or as Congress authorizes. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Waiver of a tribe's sovereign immunity, whether by Congress or by the tribe itself, " 'cannot be implied but must be unequivocally expressed.' " *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)).

■ Here, the government alleges that the Cherokee Nation waived its immunity by arguing that re-litigation of the indispensable party issue is precluded by collateral estoppel.[8] Because the Cherokee Nation argues that other cases have also previously involved the successor in interest issue, the government contends that the Cherokee Nation has waived its immunity with respect to this issue. However, the mention of an issue in a motion to dismiss is not an "unequivocally expressed" waiver of sovereign immunity. Therefore, the Cherokee Nation remains immune from suit and thus cannot be joined as a party in this action.

8. None of the parties argue that the Cherokee Nation's sovereign immunity was waived by any

### b. The Equities Favor Dismissal

In determining whether in equity and good conscience the action should proceed or be dismissed, the court should consider four factors:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provision in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

RCFC 19(b).

However, "[t]hese factors ... are not mutually exclusive, nor are they the only considerations that may be taken into account by the court in a particular case." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1607, at 88 (2d ed.1986). Moreover, "[w]hether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation ... [and] must be based on factors varying with the different cases ...." *Provident Tradesmens Bank v. Patterson*, 390 U.S. 102, 118–19, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). However, some courts have noted that "when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir.1991). This is due to a sovereign's "right not to have its legal duties judicially determined without consent." *Enter. Mgmt. Consultants v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir.1989). Nevertheless, the court will examine the four RCFC 19(b) factors.

provision in the Settlement Act.

■ With respect to the first factor, prejudice, the Cherokee Nation argues that as the titleholder to the Riverbed lands, adjudication of UKB's claim to damages based on its assertion that it is a successor in interest of the original Cherokee people would prejudice both the Cherokee Nation's title and its ability to exercise sovereignty over the same lands. The government and UKB argue that an adjudication of UKB's right to recover funds under the Settlement Act does not directly affect the Cherokee Nation's interest in the Riverbed lands, and would not be precedential for any other court. Thus, they argue, any prejudice to the Cherokee Nation is minimal. The court agrees with the Cherokee Nation that its interest in the Riverbed lands would be prejudiced by a ruling in this case. "The first factor of Rule 19(b) is concerned with whether the nonparty would 'be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor.'" *United States ex rel. Steele v. Turn Key Gaming, Inc.,* 135 F.3d 1249, 1251 (8th Cir.1998) (quoting advisory committee notes to 1966 amendments to Federal Rule of Civil Procedure 19). Because disposition of UKB's claims regarding these Riverbed lands would necessarily involve a ruling on ownership, a ruling that UKB has any compensable interest in such lands could pose an immediate and serious danger to the Cherokee Nation's ability to exercise sovereignty over these lands.

The Cherokee Nation further argues that the United States is not able to adequately represent its interests in this action, and therefore there is no mitigation of the prejudice to it. The court agrees. When "there is a conflict between the interests of the United States and the interests of Indians, representation of the Indians by the United States is not adequate." *Manygoats v. Kleppe,* 558 F.2d 556, 558 (10th Cir.1977). Here, such a conflict is demonstrated by the government's opposition to the Cherokee Nation's motion to dismiss. In such circumstances representation by the government will not be adequate to mitigate the prejudice to the Cherokee Nation.

Regarding the second factor, the Cherokee Nation argues that there is no way to shape relief so as to lessen or avoid the prejudice to it because UKB's complaint requires the court to decide the successor in interest issue or at a minimum to conclude that UKB has some compensable interest in lands over which the Cherokee Nation claims exclusive title. The government argues that the court could limit its judgment to make clear that it is not ruling on the Cherokee Nation's or UKB's sovereignty or control over the Cherokee Reservation lands. The government has not identified any authority in support of this view and the court has found none. UKB's argument has also been squarely rejected. UKB argues that prejudice can be lessened or avoided by the Cherokee Nation's full participation in the case or by its participation as an amicus. Courts have held, however, that "if the opportunity to brief an issue as a non-party were enough to eliminate prejudice, non-joinder would never be a problem ...." *Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 775 (D.C.Cir.1986). "It is wholly at odds with the policy of tribal immunity to put the tribe to this Hobson's choice between waiving its immunity or waiving its right not to have a case proceed without it." *Id.* at 776. Accordingly, the court agrees with the Cherokee Nation that the prejudice to it cannot be lessened or avoided by the shaping of relief.

Regarding the third factor, the government and UKB argue that the court can afford adequate relief to UKB, money damages, without the presence of the Cherokee Nation. While it is true that UKB's claims for money damages against the United States can be resolved without the Cherokee Nation, the court does not believe that this factor outweighs the prejudice to the Cherokee Nation.

Finally, in regard to the fourth factor, the Cherokee Nation argues that courts have consistently held that where sovereign immunity is the reason for the absence of an adequate remedy for the plaintiff, this factor weighs in favor of dismissal. The government and UKB argue that if any portion of this action is dismissed, UKB will be left without a remedy. Both the UKB and the

government argue that dismissal is therefore inconsistent with Congress' desire to provide UKB with an opportunity to prove its claim.

The court is mindful of the fact that dismissing this case will leave UKB without a remedy at this time. The court recognizes that to obtain the relief it seeks UKB would have to return to Congress and seek legislation abrogating the Cherokee Nation's sovereign immunity.[9] Nonetheless, after careful consideration, the court concludes that despite its sympathy for UKB's position, it cannot overcome the Cherokee Nation's claim of sovereign immunity.

"Courts have recognized that a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity." *Confederated Tribes*, 928 F.2d at 1500; *see also Wichita*, 788 F.2d at 777 (holding that the lack of an alternative remedy is "less troublesome" where "dismissal of [the] suit is mandated by the policy of tribal immunity"). Here, the court agrees with the Cherokee Nation that this factor weighs in favor of dismissing UKB's claims. The significant threat to the Cherokee Nation's long-recognized title and sovereignty that could arise from a ruling in favor of UKB in this case outweighs the UKB's claim to compensation.

In sum, the court finds that the Cherokee Nation is both a necessary and indispensable party in this case.[10] As such, UKB's claims must be dismissed.[11]

## CONCLUSION

For the foregoing reasons, the Cherokee Nation's motion to dismiss under RCFC 19

for failure to join an indispensable party is **GRANTED.** The Clerk is directed to dismiss the plaintiff's complaint. Each party to bear its own costs.

**IT IS SO ORDERED.**

---

9. It bears emphasis that in the Settlement Act, Congress merely created a "process" by which UKB could pursue its claim; it explicitly did not acknowledge or establish any interest UKB may have in the Riverbed lands. 25 U.S.C. § 1779f(c). While it is no doubt true that dismissing this case cuts short this "process," dismissal for failure to join an indispensable party is not forbidden by the Settlement Act. Indeed, there is no indication in the Settlement Act that Congress intended to modify this court's procedural rules or that it understood that UKB's claim of ownership would be based on the same statutes and treaties on which the Cherokee Nation also based its claim. Had UKB identified a different theory of recovery that did not implicate

the Cherokee Nation's title or sovereignty, a different result might have been appropriate.

10. Having concluded that UKB's case must be dismissed on the grounds that the Cherokee Nation is an indispensable party, the court does not reach the Cherokee Nation's alternative argument that this action must also be dismissed for lack of subject matter jurisdiction.

11. The court also finds that this dismissal qualifies as a final judgment sufficient to trigger the release of funds to the Cherokee Nation's tribal trust account pursuant to 25 U.S.C. § 1779f(b)(3).